**Robert J. HANNA and Thrya K. Hanna, Plaintiffs,**

v.

**MOTIVA ENTERPRISES, LLC and Shell Oil Company, Defendants.**

No. 09 CV 1150(VB).

United States District Court, S.D. New York.

March 9, 2012.

Howard Andrew Suckle, Suckle Schlesinger PLLC, New York, NY, for Plaintiff.

William Andrew Ruskin, Victoria Marie Sloan, Epstein, Becker & Green, P.C., New York, NY, for Defendant.

## MEMORANDUM DECISION

BRICCETTI, District Judge.

Plaintiffs Robert J. Hanna and Thrya K. Hanna bring this diversity action against defendants Motiva Enterprises, LLC ("Motiva"), and Shell Oil Company ("Shell"), alleging common law claims of negligence, trespass, and private and public nuisance, along with claims for violations of New York Navigation Law § 181 and New York Environmental Conservation Law § 23–1717.

Plaintiffs and defendants have cross-moved for summary judgment (Docs. ## 56, 61), and defendants have also moved to preclude the testimony of plaintiffs' expert. (Doc. # 52.) For the reasons set forth below, defendants' motion for summary judgment is DENIED as to their claims regarding (1) statute of limitations, except insofar as the Court grants summary judgment on the ground that only certain of plaintiffs' claims are tolled; (2) negligent infliction of emotional distress; (3) private nuisance; and (4) New York Navigation Law § 181, insofar as plaintiffs are entitled to prove damages for costs associated with the remediation of their property and attorneys' fees. Defendants' motion for summary judgment is GRANTED as to plaintiffs' claims for (1) trespass; (2) public nuisance; (3) violations of New York Environmental Conservation Law § 23–1717; and (4) damages under New York Navigation Law § 181 for diminution in their property's value. Defendants' motion to preclude expert testimony is GRANTED. Plaintiffs' motion for summary judgment is DENIED as to their claim for damages under New York Navigation Law § 181. Plaintiffs' motion is GRANTED as to defendants' statute of limitations defense and as to the issue of liability under New York Navigation Law § 181.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

## BACKGROUND

The parties have submitted briefs, stipulations of facts, and supporting exhibits, which reflect the following factual background.

Plaintiffs are owners of the residential property located at 86 Livingston Road in Scarsdale, New York. Plaintiffs purchased

658

this property in 1985. A gasoline service station operates at 1455 Weaver Street in Scarsdale, approximately 350 feet to the northeast of plaintiffs' property. Plaintiffs claim defendants are the owners of the property at 1455 Weaver Street. However, the service station was affiliated at various times with different entities. In 1985, the service station was affiliated with Texaco Refining and Marketing Inc. ("Texaco"). As of April 30, 2010, Motiva was the owner of the service station, but is no longer. Star Enterprise ("Star") owned the service station in 1991. Plaintiffs assert Star was Texaco's agent. Today the service station is a Shell-branded property.

Adjacent to the service station is a strip mall containing stores and restaurants. Plaintiffs' property abuts an overflow parking lot for the strip mall, and a creek known as the Sheldrake River flows through plaintiffs' backyard.

## I. *Hydrocarbon Seepage and Remediation*

Defendants do not dispute the service station is the source of petroleum that eventually contaminated plaintiffs' property. Plaintiffs claim that sometime after December 11, 1991, they were advised of the presence of hydrocarbons on their property. Defendants dispute this and claim plaintiffs were aware of hydrocarbons on their property well before December 11.

On August 21, 1991, International Technology Corporation ("IT Corp."), an environmental consultant for Star, responded to an odor complaint in the vicinity of the Sheldrake River. This observation was reported by Lauren Brooker of Star to the New York State Department of Environmental Conservation ("DEC") on the same date. A DEC Spill Report Form, created on August 28, 1991, indicates a sheen was observed on the stream when it rained, and pads and booms would be used as "as

needed." Absorbent pads are used to remove any "floating product" resulting from an oil spill. They are periodically removed and replaced with fresh pads.

According to IT Corp.'s September 13, 1991, report, an inspection of the creek revealed an odor only in the area of the creek behind the service station. IT Corp. believed the odor originated near a Westchester County sewer manhole cover, but further investigation of the sewer manhole revealed no odors or vapors.

Texaco retained Handex of New York ("Handex"), an environmental consultant, to investigate and remediate the spill. The February 1992 Hydrocarbon Investigation and Recovery Report prepared by Handex states "[d]uring the initial site inspection on November 20, 1991, liquid-phase hydrocarbon (LPH) was observed seeping from an area along the eastern river bank just south of the private bridge located southwest of the service station property (Figure 1). Absorbents and boom equipment were immediately employed to contain and prevent LPH from traveling downstream. This containment has been maintained on a weekly basis and during rainfall events." From "Figure 1" in the Handex report, the private bridge is located on the "Freeman Property" directly abutting the northernmost edge of plaintiffs' property.

Defendants claim that in November 1991 Handex used the absorbent pads and boom equipment to control gasoline traveling downstream and installed monitoring wells on plaintiffs' property. However, the Handex report and accompanying figures show the monitoring wells were all installed in the service station property and in the adjacent mall parking lot, not on plaintiffs' property. Further, the Handex report illustrates several "shallow soil borings" were drilled in plaintiffs' property on December 23, 1991.

On November 20, 1991, the DEC inspected the site of the leak and noted the presence of "free product," or gasoline, on the Sheldrake River. A DEC Spill Report Update Form, dated November 22, 1991, states there was, on November 20, gasoline "coming out of the ground along the stream," which collected on the stream and caused a sheen. The gasoline had a strong odor and was very black in color.

The Spill Report Update Form notes Handex "had several lines of boom placed in the stream." A fax sent by Handex on December 4, 1991, entitled "Action Plan," states on November 20, 1991, Handex "immediately employed absorbants and boom equipment to contain and prevent gasoline from traveling down stream." Plaintiffs' environmental expert, William J. Seevers, testified it was his understanding, based upon review of the August 28, 1991, DEC Spill Report Form and the November 22 Spill Report Update Form, that the absorbent pad and booms were installed on plaintiffs' property. Plaintiff Robert Hanna attributes some of the odor giving rise to plaintiffs' nuisance claims, in part, to the booms placed in the Sheldrake River. The crux of plaintiffs' nuisance claim is the persistent foul order on their property, which they generally attribute to the presence of petroleum on their property and defendants' resultant remediation activities.

On November 21, 1991, at a site meeting conducted by representatives of the DEC, Star, and Handex, continued monitoring and containment activities were discussed. The Handex Action Plan attributes the 1991 petroleum leak to a spill at the service station in 1978 that had been remediated, and states there was no evidence of any further issues until "nearby residents reported odors" in August 1991. As noted above, defendants do not dispute the service station is the source of petroleum that eventually contaminated plaintiffs' property. Robert Rule, the primary person responsible for environmental issues at 1455 Weaver Street for Motiva, testified the original release of petroleum into the ground occurred during Texaco's and Star's operation of the site.

On November 27, 1991, a Handex employee spoke with Robert Hanna about "the plan of action for delineation/containment/cleanup" Handex was planning to perform along the Sheldrake River. That same day, Star sent plaintiffs a letter advising plaintiffs "there may be hydrocarbons (gasoline, oil, etc.) in or about your premises," which, unless removed, "may present a potential hazard." The letter further requested permission on behalf of Texaco to enter plaintiffs' property to determine if hydrocarbons were present.

By letter dated December 11, 1991, Star advised plaintiffs:

> We have been advised that there may be hydrocarbons (gasoline, oil, etc.) in or about your premises, which are located near the Texaco Service Station at 1455 Weaver Street in Scarsdale, New York. Unless removed, hydrocarbons (in liquid or vapor form) may present a potential hazard. Therefore, although responsibility has yet to be determined, we request permission on behalf of ourselves, Texaco Refining and Marketing Inc. (Texaco), and our contractor, Handex of New York (Handex), to enter your premises, upon at least 24 hours' written or oral notice to you, to determine if hydrocarbons are present.

Star further advised plaintiffs that the investigation may result in disruption of the normal use of plaintiffs' property, but Star asserted it would avoid unnecessary or unreasonable disruption and would restore the property to its former condition as soon as possible after any hydrocarbons were discovered and, if necessary, removed. Star signed the agreement and

plaintiffs signed their consent on December 17, 1991. By letter dated December 18, Handex notified plaintiffs that Handex planned to enter plaintiffs' property to conduct "Phase I" work on December 24. Phase I work included soil testing, conducted by a series of hand borings, to define the possible area of the Sheldrake River from which hydrocarbons may be seeping.

Subsequent access agreements were obtained from plaintiffs, from 1991 to 2010, to conduct Phase II and Phase III work on their property. Phase II work involved collection and removal of hydrocarbons from the Sheldrake River and below the surface of plaintiffs' property, and the surrounding effected area. Collection and removal of the hydrocarbons was achieved through a subsurface trench, filled with gravel, from which collected hydrocarbons would be pumped out into a holding tank. Phase III work involved the prevention of hydrocarbon seepage into the Sheldrake River, removal of the containment equipment (e.g., floating absorbent pads and booms), and monitoring of the collection system.

Most of the work performed on plaintiffs' property was conducted on the east side of the Sheldrake River, which is the side opposite plaintiffs' home. While work was being conducted on plaintiffs' property, plaintiffs attended various meetings with defendants, defendants' consultants, and the DEC.

## II. *Tolling Agreement*

Plaintiffs retained counsel in 1991 to provide legal advice concerning the environmental activity on their property. Plaintiffs' attorney negotiated the December 11, 1991, initial access agreement with Star. On November 30, 1994, plaintiffs filed a summons, without a complaint, in New York Supreme Court, Westchester County, against Texaco.

In March 1995, plaintiffs, through their attorney, engaged in conversations with Texaco's legal counsel regarding a proposed tolling agreement intended to toll the statute of limitations with respect to plaintiffs' claims. By facsimile dated March 24, 1995, Texaco's lawyer sent plaintiffs a draft agreement seeking plaintiffs' comments. The March 24 fax states "[i]n case it's all right as is, I've signed the duplicate copies which I'm sending to you in the mail, and ask that you sign and return one copy." Later that same day Texaco's lawyer sent plaintiffs' attorney another fax, stating "[p]ursuant to our discussion this afternoon I have revised and enclosed the proposed tolling agreement. I'm sending two signed copies via mail," and would like them signed and one copy returned.

On March 30, 1995, Texaco sent a fax to plaintiffs' attorney with a revised tolling agreement. The agreement was signed by Texaco's attorney and the cover letter states "[p]lease sign and return one copy for our files." Defendants claim neither plaintiffs nor plaintiffs' attorney signed the tolling agreement. No party has produced a fully executed copy of the agreement, and plaintiffs admit their attorney cannot find a copy of the agreement with his or plaintiffs' signatures. Plaintiffs' attorney testified he has a distinct memory of signing the tolling agreement.

The tolling March 30 agreement reads as follows:

> This [Agreement] is entered into as of the 24th day of March, 1995, by and between [plaintiffs, Texaco, and Star].
> . . .
> Whereas, [plaintiffs] filed a summons, naming Texaco/Star as defendants, with the Supreme Court of the State of New York on or about November 30, 1994, but both [plaintiffs] and Texaco/Star desire to avoid litigation at this time with

respect to any claims relating to the aforesaid contamination and remediation that [plaintiffs] may wish to assert against Texaco/Star at some future time; [plaintiffs, Texaco, and Star] agree as follows:

1. The running of any and all statutes of limitations that may be applicable to any rights, claims or counterclaims for the recovery of costs or other damages incurred as a result of the aforesaid contamination and remediation is hereby tolled from the aforesaid summons filing date for a period of six months. At the expiration of said six month period the provisions of this paragraph will continue unless written notice of termination is sent via Certified Mail by either party to the other, whereupon the provisions of this paragraph will expire two months from receipt of such written notice of termination. The tolling period shall be excluded from all computations of any applicable statutes of limitations not already expired, and in the event that a claim or counterclaim is filed by one party against the other, the party against whom such claim or counterclaim is filed agrees not to plead or otherwise assert in defense of such claim or counterclaim the statute of limitations period based on any time elapsed during the tolling period.

2. [Plaintiffs] agree not to serve the aforesaid summons on Texaco/Star, or on any remediation contractor retained by them, during the tolling period except during the last 30 days thereof.
. . .

Plaintiffs commenced the instant action by filing a complaint on February 9, 2009. A summons was issued the same day. Plaintiffs did not send a written notice of termination of the tolling agreement via certified mail prior to serving the February 9 summons and complaint. Plaintiffs argue that Texaco never withdrew from the tolling agreement, and defendants argue Texaco never entered into a binding tolling agreement in the first place because plaintiffs never signed the agreement.

Plaintiffs further claim that in conformity with the tolling agreement, they provided Texaco, Star, and their successors access to their property in order to allow defendants' continued remediation of the hydrocarbon contamination. Specifically, plaintiffs assert that from December 1991 to January 30, 2009, plaintiffs repeatedly allowed defendants to dig up plaintiffs' trees, bushes, and grass in their backyard with backhoes to install, among other things, operating piping, monitoring wells, air sparging equipment, and pumping stations, in order to remediate the hydrocarbon contamination on and off plaintiffs' property. When it became clear that defendants' promises to remediate the contamination would never come true, and in reliance on the tolling agreement, plaintiffs filed the instant action. Defendants have raised a statute of limitations defense to the claims asserted in this case. In March 2011, plaintiffs' withdrew the access agreements allowing defendants and their contractors access to plaintiffs' property.

### III. *Plaintiffs' Alleged Damages*

Plaintiffs claim from December 1991 through March 1998, Texaco, Star, and their contractors removed several thousand gallons of gasoline from the service stations and the surrounding area, including plaintiff's premises. Plaintiffs further claim from March 1998 to January 2011, Texaco and Motiva continued to monitor the ground water and soil, and to extract vapors from plaintiffs' property. To monitor the groundwater for the presence of hydrocarbons on plaintiffs' and their neighbors' property, Texaco installed monitoring wells on plaintiffs' property. Plaintiffs assert that, through 2011, defendants

continued to find various levels of benzene, toluene, ethyl benzene, and xylene ("BTEX"), and methyl tertiary, butyl, and ether ("MTBE") on plaintiffs' property, and to extract vapors from the property.

Plaintiffs' nuisance complaint arises from the presence of these chemicals on their property and the resulting smell, noise, and inconvenience caused by years of remediation. Further, plaintiffs claim they are unable to use their land because it is contaminated. Defendants claim plaintiffs' noise complaint arises from the operation of an "AS/SVE" system, which is a type of remedial system designed to extract vapors from the soil. One of defendants' contractors, Deborah Mangini, testified the remediation system on plaintiffs' property utilized "lateral soil vapor extraction pipes" to extract vapors out of the ground, in order "to mitigate any odor complaints." Use of this system was approved and monitored by the DEC.

Defendants argue the sound emanating from the shed that housed the remediation system was the sole source of plaintiffs' noise complaints. Plaintiffs deny this and assert the sounds emanating from the shed are among the many noises resulting from the decades of remediation equipment brought onto their land. Defendants insulated the walls of the shed and operated it only during the hours plaintiff Robert Hanna was at his office. The system and shed were removed on March 15, 2010.

Plaintiffs first became aware of odors on their property shortly after they purchased their home in 1985. However, plaintiffs did not know the source of the odor. The pervasive odor on their property caused plaintiffs to contact the DEC, the Environmental Protection Agency, and the Westchester Health Department several times. Defendants claim the odor on plaintiffs' property may be caused by the delivery of petroleum to the service station, in close proximity to plaintiffs' property. Plaintiffs deny this theory, claiming it is impossible due to the vapor recovery systems employed by the service station and delivery trucks.

Defendants contend that recent air and groundwater tests reveal low or nonexistent levels of chemicals, but plaintiffs and their neighbor testified their properties continue to be plagued by the odor of petroleum. Plaintiffs contend the foul odor on their property was never alleviated, and defendants can never actually remediate plaintiffs' property. Joseph Mancini, a sanitarian with the Westchester County Health Department ("Health Department"), testified that, in May 2010, he went to plaintiffs' property in response to a complaint received by the Health Department and smelled the odor of petroleum by the stream behind plaintiffs' house. In 1995, photoionization detector ("PID") tests, which measure vapors from volatile organic compounds ("VOCs"), were zero or very low, except for a reading at the parking lot of the service station. On March 8, 2011, defendants' environmental consultant submitted to the DEC its quarterly groundwater monitoring and air sampling results for the first quarter of 2011, which found VOCs "below background."

IV. *Procedural History*

Plaintiffs commenced this action on February 9, 2009. On April 6, 2010, Texaco was discontinued from the case and Motiva was substituted as a defendant, assuming all liability that may be attributable to Texaco. Plaintiffs subsequently filed an amended complaint and defendants thereafter filed an answer.

On August 11, 2011, defendants filed a motion to preclude plaintiff's expert, Mauro M. Gabriele, from testifying as to the alleged health and financial risks posed by the contamination of plaintiffs' property. On August 15 defendants filed a motion for

summary judgment, claiming this action is time-barred and plaintiffs' claims for negligent infliction of emotional distress, trespass, and nuisance, among others, fail as a matter of law. Also on August 15, plaintiffs filed a motion seeking summary judgment on defendants' statute of limitation defense and on the issues of liability and damages under New York Navigation Law § 181.

## DISCUSSION

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the court, and any affidavits show there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A dispute regarding a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It is the moving party's burden to demonstrate the absence of any material factual issue genuinely in dispute. *Am. Int'l Grp., Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir.1981).

If the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. at 323, 106 S.Ct. 2548. If the nonmoving party submits evidence which is "merely colorable," summary judgment may be granted. *Anderson v. Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. 2505. The mere existence of a scintilla of evidence in support of the nonmoving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for it. *See Dawson v. Cnty. of Westchester*, 373 F.3d 265, 272 (2d Cir.2004).

On summary judgment, the Court resolves all ambiguities and draws all permissible factual inferences in favor of the nonmoving party. *See Patterson v. Cnty. of Oneida*, 375 F.3d 206, 218 (2d Cir.2004). If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir.2004).

## I. *Statute of Limitations*

This action is governed by New York's three year statute of limitations on actions to recover damages for injury to property. *See* N.Y. C.P.L.R. § 214(4); *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998). "[T]he three year period within which an action to recover damages for ... injury to property caused by the latent effects of exposure to any substance or combination of substances, in any form, ... upon or within property must be commenced shall be computed from the date of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier." N.Y. C.P.L.R. § 214–c(2); *see also Boswell v. Leemilt's Petroleum Inc.*, 252 A.D.2d 889, 676 N.Y.S.2d 313, 314 (3d Dep't 1998) ("[T]he allegations before us pertain to property damage caused by gasoline contamination. Hence, for purposes of CPLR 214–c, the claim must be deemed to have accrued when plaintiffs either knew or should have known that contamination had actually occurred by its entry onto their property.").

A. *Plaintiffs' State Lawsuit*

■ Plaintiffs filed a summons in Westchester County Supreme Court on November 30, 1994. Defendants argue this was untimely because an injury to plaintiffs' property occurred on August 21, 1991, the date on which IT Corp. responded to an odor complaint and a sheen was observed on the Sheldrake River. Alternatively, defendants argue any injury to plaintiffs' property was apparent on November 20, 1991, when Handex observed hydrocarbons seeping from an area along the Sheldrake River on plaintiffs' property and booms were placed in the Sheldrake River on plaintiffs' property, and no later than November 27, 1991, when plaintiffs spoke with a Handex employee on November 27, 1991, about "the plan of action for delineation/containment/cleanup" Handex was planning to perform along the river. If defendants are right, plaintiffs' state court lawsuit would be barred by the statute of limitations.

There is, however, no evidence plaintiffs actually observed, or through the exercise of reasonable diligence should have discovered, hydrocarbons on their property on any of the dates defendants suggest. First, although plaintiffs may have been aware of a strong odor on their property since 1985, there is no indication plaintiffs knew or should have known the cause of that odor, and whether the cause of the odor was attributable to defendants. IT Corp.'s September 13, 1991, summary of its investigation of an odor complaint and the corresponding August 28 DEC Spill Report Form only established that Lauren Booker, a Star employee, not plaintiffs, observed a sheen on the Sheldrake River when it rained, and that there may have been an odor, but the source of the odor was not determined and, upon inspection, no hydrocarbons were detected in the area.

Second, the February 1992 Handex report, the Handex Action Plan, and the DEC Spill Report Update Form do not establish that, as of November 20, 1991, plaintiffs were or should have been aware of the presence of hydrocarbons on their property and a causal linkage between those hydrocarbons and the pervasive odor on their property. These documents establish only that, as of November 20, gasoline was observed floating on the Sheldrake River and Handex immediately employed absorbent pads and boom equipment to contain and prevent gasoline from traveling down stream. The Handex report and accompanying figures show monitoring wells were installed in the service station property and in the adjacent mall parking lot, not on plaintiffs' property. In fact, the report illustrates several shallow soil borings were drilled in plaintiffs' property well after November 20, on December 23, 1991.

The only evidence defendants set forth establishing plaintiffs knew or should have known of the presence of hydrocarbons on their property as of November 20, and knew or should have known the pervasive odor was attributable to those hydrocarbons, is the testimony of plaintiffs' expert. However, plaintiffs' environmental expert was deposed on February 25, 2011, and April 8, 2011, and his testimony regarding the location of Handex's booms was based upon review of the August 28, 1991, DEC Spill Report Form and the November 22, 1991, Spill Report Update Form.

Plaintiffs' expert testified that, in his opinion, "the booms were put in the river, in the immediate vicinity of the cutoff trench, only because that's the logical thing to do." When asked if that was on plaintiffs' property, he responded "[t]hat would be on the Hanna property, correct." This testimony does not establish that plaintiffs actually knew the absorbent pads

and the booms were installed on their property as of November 20, 1991, nor does it establish plaintiffs knew or should have known on November 20 the absorbent pad and booms were being used to contain hydrocarbons that were the cause of the odor on their property.

Third, and most important for purposes of this summary judgment decision, Robert Hanna's conversation with a Handex employee on November 27, 1991, indicates plaintiffs should not have been aware of the presence of hydrocarbons, and the possible effects of those hydrocarbons, on their property. A November 27 fax from the Handex employee to Lauren Booker of Star states the employee spoke with Robert Hanna about "the plan of action for delineation/containment/cleanup" Handex was planning to perform along the river. This fax does not indicate exactly what was said to Robert Hanna, and, if anything, it establishes that Handex itself was still in the process of determining the extent of hydrocarbon presence on plaintiffs' property. *See Webster's New Collegiate Dictionary* 336 (9th ed.1984) (defining delineate: "to describe, portray, or set forth with accuracy").

Defendants' position is further undermined by the letter dated November 27, 1991, from Star to plaintiffs advising plaintiffs there *may* be hydrocarbons "in or about" their premises which, unless removed, *may* present a *potential* hazard. The November 27 letter further requested permission on behalf of Texaco to enter plaintiffs' property "to determine if hydrocarbons are present" (emphasis added). Plaintiffs certainly cannot be held to have known hydrocarbons were present on or in their property when Star and Texaco had no such knowledge.

The Court agrees with plaintiffs that the process of "delineation/containment/cleanup" likely corresponds with the Phase I, II, and III processes described in the De-

cember 11, 1991, letter from Texaco and Star to plaintiffs. That letter reiterates the language in Star's November 27 letter, and again seeks permission to enter plaintiffs' property to determine if hydrocarbons are present. The December 11 letter also sets forth the various proposed phases of work to be performed on plaintiffs' property, the first of which is "[t]o define the possible area of the stream bank from which hydrocarbons may be seeping." Thus, as of December 11, 1991, Texaco and Star, by their own admission, did not know whether hydrocarbons were present on plaintiffs' property.

Defendants argue, essentially, that if Handex discovered hydrocarbons and placed booms in the Sheldrake River on or before November 20, 1991, it would have been obvious that gasoline hydrocarbons were present in and on plaintiffs' property and that the odor complained of by plaintiffs stemmed from the presence of those hydrocarbons. If this were true, however, it is highly suspicious that Star and Texaco would communicate, on November 27 and December 11, their uncertainty as to the presence of hydrocarbons on plaintiffs' property, since Handex was working for Texaco. In light of defendants' argument here, these communications indicate one of two things: either (1) it was not obvious hydrocarbons were present in or about plaintiffs' property, or (2) Star and Texaco knew, or should have known, and obfuscated the presence of hydrocarbons to plaintiffs.

Defendants argue there is no requirement under New York law that plaintiffs know the precise contaminant on their property to trigger the statute of limitations. In support defendants cite *Russo v. Keyspan Corp.*, 18 Misc.3d 1118(A), 2008 WL 171017 (N.Y.Sup. Jan. 22, 2008). However, the court in *Russo* held that while the plaintiffs may not have under-

stood the significance or extent of their property's contamination "once the [p]laintiffs were contacted by the [d]efendants, *told that their land was contaminated* and received an offer by KeySpan to purchase the land, the three year Statute of Limitations began to run." *See id.* at \*2 (emphasis added). Here, plaintiffs were never told prior to November 30, 1991, their property was contaminated. To the contrary, Texaco and Star told plaintiffs only that there may be hydrocarbons present on or in plaintiffs property.

Further, *Boswell v. Leemilt's Petroleum* held that a claim for trespass and nuisance due to the seepage of gasoline onto plaintiffs' property, and the resultant pervasive vapors, accrued when plaintiffs first noticed black pigmentation inside the south wall of their home. *See* 676 N.Y.S.2d at 314–15. The timing of plaintiffs' notice coincided with defendants' consultant's request for permission environmentally to assess plaintiffs' property. *See id.* Here, as stated above, there is no evidence plaintiffs actually noticed gasoline seepage, or evidence of gasoline seepage, on their property and attributed the odor to that gasoline prior to November 30, 1991.

Thus, the Court holds that plaintiffs neither knew nor should have known before November 30, 1991, that hydrocarbons contaminated their property and those hydrocarbons were the cause of the odor on their property. What plaintiffs did before November 30 was decide to cooperate with Star, Texaco, and other agencies and contractors in allowing these entities to determine if hydrocarbons were present on their property. Plaintiffs should not be punished for that. Accordingly, plaintiffs timely filed a summons in Westchester County Supreme Court on November 30, 1994.

## B. *The Tolling Agreement and the Present Action*

Defendants next contend the tolling agreement negotiated between plaintiffs, Texaco, and Star did not preserve any of plaintiffs' viable claims as of November 30, 1994, and therefore the present action was untimely filed, because no contract was ever consummated. Defendants argue the tolling agreement was never consummated because neither plaintiffs nor plaintiffs' attorney ever signed the agreement.

■■■ "Under New York law, parties are free to enter into a binding contract without memorializing their agreement in a fully executed document. This freedom to contract orally remains even if the parties contemplate a writing to evidence their agreement. In such a case, the mere intention to commit the agreement to writing will not prevent contract formation prior to execution." *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985). The Second Circuit has articulated several factors to consider in determining whether the parties intended to be bound in the absence of a document executed by both sides. "The court is to consider (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." *Id.*

### i. *Express Reservation*

■■ The tolling agreement sent to plaintiffs on March 30, 1995, contains no express indication that plaintiffs, Texaco, and Star intended to be bound by the agreement only if the agreement was signed by all parties. Nothing in the cover letter or the agreement itself states the

tolling agreement became effective only upon the signatures of plaintiffs, Texaco, and Star. *Cf. Kaczmarcysk v. Dutton*, 414 Fed.Appx. 354, 355 (2d Cir.2011) (holding the parties intended to bind themselves until the agreement had been signed when the proposed agreement provided that "[t]his agreement is effective when it has been fully executed by all parties"); *Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 324 (2d Cir.1997).

Paragraph five of the tolling agreement sent to plaintiffs by Texaco's counsel on March 30 states: "By signing below, the signatories represent that they are duly authorized to enter into this Agreement on behalf of [plaintiffs] and Texaco/Star." Defendants argue this clause clearly signifies the agreement was predicated on plaintiffs' signature. This paragraph, however, does not state the tolling agreement is only effective when plaintiffs, Texaco, Star, or their respective signatories signed the agreement. This paragraph merely indicates that the lawyers for plaintiffs, Texaco, and Star were authorized to sign the agreement in their respective clients' stead.

Furthermore, Texaco and Star evinced an intent to be bound by the tolling agreement. Their attorney sent plaintiffs' attorney two different drafts of the agreement on March 24, 1995, and one on March 30. Each draft was signed on behalf of Texaco and Star, and the cover letter accompanying each asked plaintiffs' attorney to sign and return one copy on behalf of plaintiffs. The first draft sent on March 24 stated: "In case it's all right as is, I've signed the duplicate copies which I'm sending to you in the mail, and ask that you sign and return one copy."

At his deposition, the attorney for Texaco and Star, Stephen H. Bard, testified "Texaco offered to abide by the terms … if they were accepted by counsel for the Hannas, assuming counsel for the Hannas

didn't ask for another change." Bard did not say Texaco was prepared to abide by the terms of the agreement only if plaintiffs' counsel signed the agreement; acceptance was apparently enough, no matter how that was indicated. Moreover, Texaco's acceptance of the agreement hinged on the absence of further changes to the agreement from plaintiffs' counsel. Neither party has produced any evidence indicating the March 30 tolling agreement was further altered or indicating any alterations were even contemplated. Bard testified he thought it was unusual for plaintiffs' attorney not to execute and return the agreement, but he did not state there was an understanding the agreement was effective only upon plaintiffs' attorney's signature.

Defendants contend the Court should not consider parol evidence to "fill in" the missing signature. However, "[i]n any given case it is the intent of the parties that will determine the time of contract formation. To discern that intent a court must look to 'the words and deeds [of the parties] which constitute objective signs in a given set of circumstances.' These circumstances may be shown by 'oral testimony or by correspondence or other preliminary or partially complete writings.'" *Winston v. Mediafare Entm't Corp.*, 777 F.2d at 81 (citing Restatement (Second) of Contracts § 27). Therefore, the Court finds that neither party expressly reserved the right not to be bound prior to the full execution of the tolling agreement, and the language in the correspondence between Texaco, Star, and plaintiffs reveals the exact opposite: defendants intended to abide by the terms of the March 30 agreement if plaintiffs' counsel did not seek further alterations to the agreement.

### ii. *Partial Performance*

Defendants argue the second *Winston* factor is not met in this instance because

plaintiffs failed to act in accordance with the terms of the March 30 tolling agreement. The agreement states:

1. The running of any and all statutes of limitations that may be applicable to any rights, claims or counterclaims for the recovery of costs or other damages incurred as a result of the aforesaid contamination and remediation is hereby tolled from the aforesaid summons filing date for a period of six months. At the expiration of said six month period the provisions of this paragraph will continue unless written notice of termination is sent via Certified Mail by either party to the other, whereupon the provisions of this paragraph will expire two months from receipt of such written notice of termination.

. . .

2. [Plaintiffs] agree not to serve the aforesaid summons on Texaco/Star, or on any remediation contractor retained by them, during the tolling period except during the last 30 days thereof.

Defendants argue plaintiffs never sent written notice of termination via Certified Mail prior to commencing this action and thus failed to comply with the tolling agreement. According to defendants, this failure to comply indicates plaintiffs never believed they had entered into a binding tolling agreement.

The Court disagrees. The words "aforesaid summons" clearly refer to the filing of the summons in New York Supreme Court on November 30, 1994, as set forth in the recitals of the tolling agreement. Thus, on the one hand, the agreement contemplates that plaintiffs would not serve the summons they filed in state court on November 30, 1994, on Texaco, Star, or any other environmental contractor hired to work on plaintiffs' property until, at the earliest, the last thirty days of the tolling agreement. On the other hand, the March 30 agreement specifically considers that a new claim may one day be filed: "[t]he tolling period shall be excluded from all computations of any applicable statutes of limitations not already expired, and *in the event that a claim or counterclaim is filed by one party against the other . . . .*" Nothing in the March 30 tolling agreement indicates plaintiffs must have first terminated that agreement before commencing the present action. This is confirmed by Bard's testimony that paragraph 2 of the agreement refers to a particular summons and the agreement anticipated claims to be filed in the future.

Thus, plaintiffs did not breach the March 30 agreement. In fact, plaintiffs acted in accordance with the plain language of the agreement, in part performance thereof, by not serving the November 30, 1994, summons on Texaco, Star, or their successors or contractors.

### iii. *All Terms Agreed Upon*

Defendants rely on the language of the cover letter to the March 30 agreement, which states it was a "proposed tolling agreement," as evidence that the third *Winston* factor is not met. Another way to state whether all the terms of a proposed agreement were agreed upon is "whether there was literally nothing left to negotiate or settle, so that all that remained to be done was to sign what had already been fully agreed to." *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 76 (2d Cir.1984). As stated above, Texaco and Star were prepared to abide by the terms of the agreement absent further changes to the agreement from plaintiffs' counsel, and neither party has produced any evidence indicating the March 30 tolling agreement was further altered or indicating any alterations were contemplated. Therefore, the Court concludes all the terms of the proposed tolling agreement were agreed upon.

#### iv. Type of Contract Usually Committed to Writing

The final factor to be considered is whether the agreement at issue here was the type of contract that is usually put in writing. In considering this factor, the Court may look to the complexity of the transaction at issue. *See Winston v. Mediafare Entm't Corp.*, 777 F.2d at 83. This tolling agreement is not, and contemplates nothing, complex. It is a three-page document tolling the statute of limitations on plaintiffs' claims from November 30, 1994. This is not the type of agreement that must be committed to writing prior to becoming effective. Defendants have not pointed to any applicable law indicating otherwise.

In sum, these four factors indicate the parties entered into a binding tolling agreement, even in the absence of a document executed by both sides. "No single factor is dispositive; rather, all four factors should be considered for their bearing on the parties' intent in the context of the entire case." *Langreich v. Gruenbaum*, 775 F.Supp.2d 630, 636 (S.D.N.Y.2011). The documents and testimony provided by the parties illustrate (1) plaintiffs, Texaco, and Star contemplated tolling the statute of limitations for "any rights, claims or counterclaims for the recovery of costs or other damages" incurred as a result of the contamination and remediation in the vicinity of the service station; (2) Texaco and Star intended to be bound by the March 30 tolling agreement, absent any further changes requested by plaintiff; (3) no further changes were requested; and (4) in reliance on the March 30 agreement plaintiffs never served the summons filed in New York Supreme Court on Texaco or Star, or "on any remediation contractor retained by them." There is no evidence that any party ever served a written notice of termination of the March 30 tolling agreement; therefore, the agreement was still in effect when plaintiffs commenced the present action. The instant action was timely filed.

#### C. Post–1994 Claims

█ Defendants argue the tolling agreement does not toll claims that arose after November 1994. Defendants rely on paragraph one of the agreement, which states any and all statutes of limitations are tolled as to any claims for the recovery of "damages incurred as a result of the aforesaid contamination and remediation," and contend plaintiffs are only able to pursue claims that accrued between November 30, 1991, and November 30, 1994. Texaco's counsel testified that when he drafted the words in the tolling agreement "in the event that a claim or counterclaim is filed" he was referring to "[f]uture claims relating to claims that existed at the time the tolling agreement should have been executed, not indeterminant [sic] future claims based on future events."

Plaintiffs contend the original release of petroleum occurred in the 1970's at the service station and the hydrocarbons from that spill migrated and eventually seeped onto plaintiffs' property over the ensuing years. Plaintiffs claim the tolling agreement encompasses all contamination stemming from the 1970's spill up to and including the present continuing seepage of petroleum byproducts onto their property.

To the extent plaintiffs argue the tolling agreement encompasses all potential claims arising from the 1970's to the present, this argument is rejected. The tolling agreement clearly contemplated tolling the statutes of limitations on any claims accrued as of November 30, 1994. The tolling agreement did not toll the statutes of limitations for any claims accruing after that date.

Also, it is not clear from the record when the original petroleum release oc-

curred. As stated above, plaintiffs did not discover the injury to their property until sometime after November 30, 1991. Thus, as contemplated by N.Y. C.P.L.R. § 214–c(2), plaintiffs are entitled to argue the hydrocarbons contaminating their property resulted from a petroleum spill in the 1970s. Only plaintiffs' claims accruing between November 30, 1991, and November 30, 1994, are timely, and defendants are granted summary judgment on the ground that the tolling agreement did not toll the statutes of limitations on any claims accruing before or after these dates.

## II. *Negligent Infliction of Emotional Distress*

■ Defendants move to dismiss plaintiffs' claims for emotional distress. Five of the eight causes of action asserted in the amended complaint seek damages for emotional distress. Defendants argue damages are not recoverable for emotional distress caused by property damage. Defendants' argument has some merit. *See In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.,* 379 F.Supp.2d 348, 430 (S.D.N.Y.2005) ("[D]amages are not recoverable for anxiety caused by property damage . . . ."). In that case the court held "plaintiffs may only recover for emotional distress caused by injury or fear of injury to the person. To maintain a cause of action for emotional distress following exposure to a toxic substance, a plaintiff must establish (1) that he or she was in fact exposed to the disease-causing agent, and (2) there is a rational basis for his or her fear of contracting a disease. 'A rational basis has been construed to mean the clinically-demonstrable presence of a toxin in the plaintiff's body, or some other indication of a toxin-induced disease.'" *Id.* (citations omitted).

■ However, there is authority supporting the plaintiffs' argument that damages for emotional distress are available in nuisance actions. *See Taylor v. Leardi,* 120 A.D.2d 727, 502 N.Y.S.2d 514, 516 (2d Dep't 1986) ("It is settled that discomfort and inconvenience caused by a disturbance to real property are valid grounds of recovery in an action to recover damages for a nuisance."). The court in *Taylor* upheld a trial court's award of damages for emotional distress resulting from the numerous explosive blasts from a nearby mining operation, "which sent tremors vibrating through the plaintiffs' home sufficient to rattle and break jars stored in cabinets" and on certain occasions showered debris onto the plaintiffs' property. *Id.* The Second Circuit has noted the existence of this principle. *See Mehlenbacher v. Akzo Nobel Salt, Inc.,* 216 F.3d 291, 295 n. 3 (2d Cir.2000); *see also Petition of N.J. Barging Corp.,* 168 F.Supp. 925, 937 (S.D.N.Y. 1958) (holding houseowners who lost use of their beach and shore because of an oil spill were entitled to an "award of compensation for such annoyance, inconvenience and discomfort suffered by particular claimants to the extent of and in an amount commensurate with the annoyance and discomfort proven"); Tracy A. Bateman, *Nuisance as Entitling Owner or Occupant of Real Estate to Recover Damages for Personal Inconvenience, Discomfort, Annoyance, Anguish, or Sickness, Distinct From, or in Addition to, Damages for Depreciation in Value of Property or its Use,* 25 A.L.R.5th 568 (1994) ("It seems to be the prevailing view in most jurisdictions that, in a nuisance action, an owner or occupant of real estate is entitled to recover damages for personal inconvenience, discomfort, annoyance, anguish, or sickness, distinct from, or in addition to, damages for depreciation in value of property or its use."). Therefore, the Court holds plaintiffs are entitled to seek damages to the extent they suffered discomfort, annoyance, and anguish resulting from the contamination of their property.

Plaintiffs testified they suffered no physical injury or disease related to the alleged contamination of their property. Rather, Robert Hanna testified the contamination created a "festering, gnawing kind of environment." He further testified the contamination rendered him uncomfortable, angry, hopeless, hateful, fearful, and annoyed. The evidence in the record supports plaintiffs' claim that, at the least, the use of their property was rendered uncomfortable or inconvenient due to the continuous smells resulting from the hydrocarbon contamination.

Thus, while there is no evidence plaintiffs suffered emotional distress due to fear of physical injury resulting from the contamination of their property, there is a genuine issue of material fact as to whether, and to what extent, plaintiffs suffered discomfort, annoyance, and anguish resulting from the contamination. Accordingly, summary judgment is denied as to this claim.

### III. Trespass

Defendants next move for summary judgment on plaintiffs' trespass claim. Plaintiffs allege defendants trespassed on plaintiffs' property due to the release of hydrocarbons from the service station. "Under New York law, trespass is the intentional invasion of another's property." *Scribner v. Summers,* 84 F.3d 554, 557 (2d Cir.1996). To be liable, the trespasser need not intend or expect the damaging consequences of his intrusion; "rather, he need only 'intend the act which amounts to or produces the unlawful invasion.' The intrusion itself 'must at least be the immediate or inevitable consequence of what [the trespasser] willfully does, or which he does so negligently as to amount to willfulness.' " *Id.* (citations omitted). When trespass claims arise from the movement of noxious liquids from one property to another, the appropriate standard is whether defendants: (1) intended the act which amounts to or produces the unlawful invasion, and (2) had good reason to know or expect that subterranean and other conditions were such that there would be passage of the contaminated water from defendants' to plaintiffs' land. *See id.*

There is virtually no evidence in the record before the Court of the origin or cause of the petroleum spill at the service station. Defendants do not dispute the hydrocarbons contaminating plaintiffs' property originated from a spill or leak occurring at the service station in the 1970s. However, there is no evidence how that spill occurred, let alone whether defendants intentionally acted in a way that caused the leak or were so negligent in their actions that their actions amounted to willfulness in causing the leak. In other words, there is no evidence the original release of petroleum was anything other than an accident.

Plaintiffs claim defendants knew of the 1970s spill, and knew plaintiffs' property is located just 350 feet away and 50 feet below the grade of the service station. Despite this knowledge, plaintiffs argue, defendants did nothing to prevent the discharge from the 1970s spill from eventually migrating to plaintiffs' property. However, plaintiffs admit the Handex Action Plan references a spill at the service station in 1978 that had been remediated, and that there had been no evidence of any further issue related to that spill until nearby residents reported odors in August 1991. There is no evidence defendants intentionally, or negligently, took any action after the original release that caused the hydrocarbons from that release to migrate to, or failed to prevent the hydrocarbons from migrating to, plaintiffs' property. In fact, as plaintiffs admit in their motion papers, no proof whatsoever is offered of what defendants did from the 1970s to 1991.

Plaintiffs' reliance on *Scribner* is misplaced. In that case, the Second Circuit held the defendants intended the acts that caused an invasion of the plaintiffs' property because the defendants knew barium was a hazardous waste but continued to take barium-tainted furnaces outside, demolish them using jackhammers, and wash the furnaces down with water, all in close proximity to the plaintiffs' property. *See Scribner v. Summers*, 84 F.3d at 558. Here, however, there is no evidence the contamination of plaintiffs' property was anything but inadvertent (i.e., nonwillful), and there is no evidence defendants had good reason to know or expect the invasion of plaintiffs' property would occur.

Accordingly, plaintiffs' trespass claim is dismissed. *See Kara Holding Corp. v. Getty Petroleum Marketing, Inc.*, 2004 WL 1811427, at *16–17 (S.D.N.Y. Aug. 12, 2004) (dismissing plaintiff's trespass claim because there was no evidence that defendants even knew about the discharge of petroleum from defendants' to plaintiff's property, and rejecting plaintiff's argument that defendants' failure to undertake additional remediation, combined with defendants' alleged knowledge that the flow of groundwater would carry the contamination onto plaintiff's property, created an inference of intentional action); *Phillips v. Sun Oil Co.*, 307 N.Y. 328, 330–31, 121 N.E.2d 249 (1954) (upholding dismissal of trespass claim when there was no indication as to how fluid passed from defendant's to plaintiff's property or that defendant knew, or had been put on notice, that gasoline was escaping from its underground tank).[1]

### IV. Public Nuisance

Defendants seek to dismiss plaintiffs' public nuisance claim. "A public, or as sometimes termed a common, nuisance is an offense against the State and is subject to abatement or prosecution on application of the proper governmental agency." *Copart Indus., Inc. v. Consol. Edison Co. of N.Y.*, 41 N.Y.2d 564, 568, 394 N.Y.S.2d 169, 362 N.E.2d 968 (1977). "A public nuisance exists for conduct that amounts to a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place or endangering or injuring the property, health, safety or comfort of a considerable number of persons." *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 292, 727 N.Y.S.2d 49, 750 N.E.2d 1097 (2001). "A public nuisance is actionable by a private person only if it is shown that the person suffered special injury beyond that suffered by the community at large." *Id.*

Plaintiffs allege defendants' actions significantly interfered with and damaged the public in the exercise of rights common to all by creating a condition that poses a significant threat to the public health, safety, and environment. However, there is no evidence defendants' actions have substantially interfered with the exercise of a common right of the public. The evidence shows the contamination, and defendants' testing and remediation efforts, affected the service station and the surrounding area, including a strip mall, plaintiffs' property, and their neigh-

---

**1.** To the extent plaintiffs assert a trespass claim against defendants for entering plaintiffs' property to conduct testing or perform remediation work, that claim is also dismissed. Plaintiffs signed access agreements granting defendants permission to enter their property to conduct these activities. Therefore, plaintiffs have no claim for trespass arising from defendants' testing and remediation work. *See, e.g., Kaplan v. Incorporated Village of Lynbrook*, 12 A.D.3d 410, 784 N.Y.S.2d 586, 588 (2d Dep't 2004) ("[A]n 'action for trespass over the lands of one property owner may not be maintained where the purported trespasser has acquired an easement of way over the land in question.' ").

bors' property. There is no evidence of any public awareness of this contamination, and no evidence the contamination injured the property, health, safety or comfort of a "considerable number of persons" or the "community at large." *See Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d at 292, 727 N.Y.S.2d 49, 750 N.E.2d 1097; *Kaplan v. Inc. Vill. of Lynbrook*, 12 A.D.3d 410, 784 N.Y.S.2d 586, 588 (2d Dep't 2004).

Plaintiffs argue the community at large was affected by the contamination because some of the contaminated areas, the service station and the mall, are open to the public. However, the Court will not infer that simply because these areas are open to the public a considerable number of people, who are likely only at the service station or mall for relatively brief periods of time, were harmed. *Caldarola v. Town of Smithtown*, 2010 WL 6442698, at *16 (E.D.N.Y. July 14, 2010) ("[T]he Court cannot infer that a considerable number of people in New York are being harmed or that there has been an impact on some right or privilege common to every person in the community." (internal quotations omitted)), *adopted by* 2011 WL 1336574 (E.D.N.Y. Apr. 04, 2011).

For these reasons, plaintiffs' public nuisance claim is dismissed.

## V. *Private Nuisance*

Defendants seek summary judgment on plaintiffs' private nuisance claims on the grounds that (1) plaintiffs have not established a prima facie case of odor nuisance, and (2) plaintiffs' complaints regarding noise from defendants' remediation system do not constitute a nuisance.

 "[O]ne is subject to liability for a private nuisance if his conduct is a legal cause of the invasion of the interest in the private use and enjoyment of land and such invasion is (1) intentional and unreasonable, (2) negligent or reckless, or (3)

actionable under the rules governing liability for abnormally dangerous conditions or activities." *Copart Indus., Inc. v. Consol. Edison Co. of N.Y.*, 41 N.Y.2d at 569, 394 N.Y.S.2d 169, 362 N.E.2d 968; *Scribner v. Summers*, 84 F.3d at 559. An invasion of another's interest in the use and enjoyment of land is "intentional in origin" when the actor (1) acts for the purpose of causing it or (2) knows it is resulting or is substantially certain to result from his conduct. *Scribner v. Summers*, 84 F.3d at 559. " '[W]henever a nuisance has its origin in negligence,' negligence must be proven." *Copart Indus., Inc. v. Consol. Edison Co. of N.Y.*, 41 N.Y.2d at 569, 394 N.Y.S.2d 169, 362 N.E.2d 968; *Murphy v. Both*, 84 A.D.3d 761, 922 N.Y.S.2d 483, 486 (2d Dep't 2011). Here, there is no evidence the contamination of plaintiffs' property, the allegedly resultant odor, or the noise from the remediation system was the result of any intentional action by defendants. Therefore, plaintiffs' private nuisance claims sound in negligence.

### A. *Odor Nuisance*

Defendants contend plaintiffs cannot establish causation linking the odors plaintiffs complain of to gasoline vapors in the absence of expert testimony and air sampling data.

Defendants cite to several cases purportedly standing for the proposition that, due to plaintiffs' proximity to the strip mall and service stations, the source of odors is not within the common knowledge of a lay jury and plaintiffs are required to establish causation with expert testimony or other "competent scientific information." *See Jedlica v. Town of Hempstead*, 14 Misc.3d 1222(A), 2007 WL 216289, at *4 (N.Y.Sup. Jan. 26, 2007) (holding (1) the source of the noise and vibrations, particularly when there were a vast number of potential sources surrounding plaintiffs'

home, is simply "not a matter of common knowledge which a lay jury could decide in the absence of expert testimony" and (2) plaintiffs' failure to support their nuisance claim with any expert testimony or empirical evidence was fatal); *Satterfield v. J.M. Huber Corp.*, 888 F.Supp. 1567, 1571 (N.D.Ga.1995) ("[P]laintiffs have again failed to introduce any form of expert testimony or scientific evidence that the source of the alleged noise, airborne pollutants and odor is emanating from defendant's plant. This is particularly relevant in light of the numerous alternative sources for such invasions in the immediate area surrounding plaintiffs' property."); *Layton v. Yankee Caithness Joint Venture, L.P.*, 774 F.Supp. 576, 578–79 (D.Nev.1991) ("Without competent scientific evidence that [defendant's] plant is the source of the hydrogen sulfide smell around Plaintiffs' homes, the nuisance action based on emission of hydrogen sulfide must be dismissed."); *Dickens v. Oxy Vinyls, LP*, 631 F.Supp.2d 859, 866 (W.D.Ky. 2009) (expert testimony and tests did not establish that defendant's emissions caused noxious odors or that vinyl chloride was present in any level that allows individuals to actually smell it).

Plaintiffs do not dispute their environmental expert is not an odor expert and was not retained to evaluate whether the odor on plaintiffs' property constitutes a nuisance.

The Court, however, finds the cases cited by defendants unpersuasive. *Satterfield*, in particular, differs in two respects from the case at hand. First, the court in *Satterfield* found the lack of expert or scientific evidence "particularly relevant in light of the numerous alternative sources for such invasions in the immediate area surrounding plaintiffs' property." *Satterfield v. J.M. Huber Corp.*, 888 F.Supp. at 1572. The court held that "because of the considerable distance between defendant's plant and plaintiffs' residence," plaintiffs' lay testimony was not "rationally based on the perception of the witness" as required under Fed.R.Evid. 701. *See id.* ("There are numerous admissions in the record by plaintiffs that they cannot see defendant's plant from their residence and that they are not substantially certain where dust, noise and odors around their residence are coming from. Therefore, without *any* expert testimony or scientific evidence, the court finds that plaintiffs' fail to meet their burden as to causation on behalf of defendant."). Second, the court in *Satterfield* held the plaintiffs' failure "to introduce *any* form of expert testimony or scientific evidence" that the source of the alleged noise, airborne pollutants, and odor was emanating from defendant's plant was fatal to their claim. *See id.*

■ Here, there is no dispute that plaintiffs' property was contaminated by petroleum hydrocarbons. Defendants do not dispute the service station is the source of petroleum that eventually contaminated plaintiffs' property. Unlike in *Satterfield*, the service station is in close proximity to plaintiffs' property; specifically, the service station is located approximately 350 feet to the northeast of plaintiffs' property. Plaintiffs' property is located 50 feet below the service station's grade and the segment of the Sheldrake River that runs through plaintiffs' property is downstream from the service station. Moreover, defendants employed a soil vapor extraction system, in order "to mitigate any odor complaints," which discharged vapors extracted from the soil into the atmosphere.

Also, there is some "scientific evidence" linking the odor with the chemical components of gasoline contaminating plaintiffs' property. The November 22, 1991, DEC Spill Report Update Form states there was, on November 20, gasoline "coming

out of the ground along the stream," which collected on the stream, caused a sheen, had a strong odor, and was very black in color. The August 28, 1991, DEC Spill Report Form includes an entry under a section entitled "DEC Remarks," dated July 18, 2007, stating "seep and odor near stream reoccurring." The Handex Action Plan references "gasoline and associated odors at the stream."

While the Court does not know the precise scientific nature of this evidence (i.e., whether the DEC used any instruments to gauge how strong the odor was), the DEC is certainly experienced in this area and their documentation of the contamination and odor is sufficient for a jury to consider. Indeed, the mission of the DEC's Division of Environmental Remediation is "preventing releases to the environment through the regulation of bulk storage, hazardous waste, and radiation facilities and the transporters of regulated waste; and responding to, investigating, and remediating releases of contaminants that have occurred." N.Y. State Dep't of Envtl. Conservation, *Division of Environmental Remediation 2010/2011 Annual Report* 4 (2011). Further, Joseph Mancini, a Westchester County Health Department sanitarian, testified he went to plaintiffs' property in May 2010 and smelled petroleum by the stream behind plaintiffs' house. Mancini's responsibilities at the Health Department include spill response and petroleum bulk storage inspections, and, in the course of his job, he has encountered the odor of petroleum.

The court in *Layton* held the plaintiffs "failed to present *any competent evidence* that odors from [defendant's] plant have invaded their property *at all.*" *Layton v. Yankee Caithness Joint Venture, L.P.,* 774 F.Supp. at 578 (emphasis added). Furthermore, the court found (1) the defendant presented "extensive and uncontroverted scientific evidence in support of its claims" that the odors around plaintiffs' homes do not originate at defendant's plant and (2) the defendant had met all Environmental Protection Agency and county health department standards for the emission of hydrogen sulfide, the chemical to which plaintiffs attributed the odor. *See id.* at 579.

Here, as stated above, this is not the case. The DEC reports indicated an odor emanating from the Sheldrake River and attributed that odor to gasoline contaminating the ground and the stream. Defendants have not pointed the Court to uncontroverted scientific evidence establishing that the odors on and around plaintiffs' property did not originate from the petroleum leaked from the service station. Defendants have simply set forth evidence that VOCs were very low, nonexistent, or "below background" according to air testing results for the first half of 1995 and the first quarter of 2011. This Court will not take these test results as indications of the air quality, or odor, on or around plaintiffs' property for other time periods.

The other cases cited by defendants can be similarly distinguished. *Dickens v. Oxy Vinyls, LP,* 631 F.Supp.2d at 866 (plaintiffs "offer *no* evidence linking any smell to [defendant's] Facility" (emphasis added)); *Jedlica v. Town of Hempstead,* 2007 WL 216289, at *4 (plaintiffs' "failure to support their claim at this juncture with *any* expert testimony *or* empirical evidence is fatal" (emphasis added)).

Therefore, plaintiffs have presented a genuine issue of material fact as to whether the pervasive foul odor on their property directly resulted from the admitted contamination of plaintiffs' property by petroleum from defendants' service station. It is for a jury to consider the numerous potential business records submitted to the Court and to decide whether or not the testimony of plaintiffs, plain-

tiffs' neighbors, defendants' contractors, and officials from the DEC and Westchester County Health Department, among others, is to be credited, and whether the odor on plaintiffs' property was caused by the petroleum contamination. *See United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994).

### B. *Noise Nuisance from Defendants' Remediation Activities*

Defendants argue the remediation system, located on the strip mall's property, was operated at the direction and under the supervision of the DEC, and, as such, the noise from the system should not be considered unreasonable as a matter of public policy in the absence of special circumstances. The Court finds this argument unpersuasive. Defendants have cited no case indicating simply that because the activity performed was done pursuant to government oversight the activity is not unreasonable, negligent, or reckless. The Court agrees that "when the use of a property is expressly authorized for the operation of a business or activity, and its operation is reasonable, no actionable per se nuisance is created." *Stanley v. Amalithone Realty, Inc.*, 31 Misc.3d 995, 921 N.Y.S.2d 491, 499 (N.Y.Sup.2011). However, the question is whether defendants' operation of the remediation system was reasonable. This question is one for a jury to consider.

Defendants argue Robert Hanna is not an "ordinary reasonable person," as required in a nuisance action, *see Impellizerri v. Jamesville Federated Church*, 104 Misc.2d 620, 428 N.Y.S.2d 550, 552 (N.Y.Sup.1979), because he is a frequent migraine sufferer and the noise from the remediation system affected him more than it would a normal person. Furthermore, defendants argue the noise from the system was only intermittent; was only audible when Robert Hanna was at work because defendants obtained permission in 2008 from the DEC to operate the system during the daylight hours only in response to Mr. Hanna's concerns about the sound; and ceased altogether in March 2010 when the system was shut down and removed. Defendants also installed insulation in the remediation system unit to muffle the sound emanating from it.

However, these are all considerations for a jury to take into account when assessing the reasonableness of the remediation system and of plaintiffs' response thereto. Plaintiffs also claim the sounds from the remediation system are among the many noises resulting from defendants' remediation efforts. The Court cannot say the defendants' operation of the remediation system and remediation work generally was reasonable, and therefore not a nuisance, as a matter of law. Therefore, plaintiffs have raised a triable issue of fact as to whether the noise from defendants' operation of the remediation system, and remediation work on plaintiffs' property, constituted a nuisance.

### VI. *Plaintiffs' Negligence Claim*

As stated above, there is no evidence of nuisance based on defendants' intentional actions, and plaintiffs' nuisance claims sound in negligence. Therefore, plaintiffs' separate negligence claim is duplicative and is dismissed. *Murphy v. Both*, 922 N.Y.S.2d at 486 ("Where, as here, a nuisance arises solely from negligence, the nuisance and negligence elements may be so intertwined as to be practically inseparable, as they are here. The plaintiff may recover only once for harm suffered, regardless of how the causes of action are denominated.").

### VII. *Environmental Conservation Law § 23–1717*

Defendants argue there is no private right of action under New York Environmental Conservation Law § 23–1717,

and therefore plaintiffs' claim under this provision should be dismissed. Plaintiffs do not respond to this argument in their motion papers. Section 23–1717(8) provides that:

> The storage ... of liquified natural and petroleum gas within the state, in view of its extreme volatility, high flammability and dangerous qualities, if mishandled, resulting in accidental release, is determined to be hazardous and entails strict liability on the part of any person, ... that undertakes such activities in the State. Neither compliance with the requirements of this title nor the exercise of due care shall excuse any such person from liability for personal or property damage determined to be caused by the accidental release of liquified natural or petroleum gas within the State, and neither proof of means of ignition nor distinctions between directing consequential damage shall relieve such person of absolute liability without regard to intent or negligence of any person or property damage thereby caused.

N.Y. Envtl. Conserv. Law § 23–1717(8).

After review of the statute and case law, the Court agrees with defendants. N.Y. Envtl. Conserv. Law § 23–1715 charges the DEC with enforcement of various provisions of Article 23. This section also provides that the expense of enforcement of the Environmental Conservation Law, including, specifically, Section 23–1717, shall be allocated by the DEC. *See id.* § 23–1715(2). Nothing in the law points to the existence of a private cause of action. Accordingly, plaintiffs' claim under this provision is dismissed. *See Johnson v. Monsanto Chem. Co.*, 129 F.Supp.2d 189, 195 n. 1 (N.D.N.Y.2001) ("Plaintiffs point to no private cause of action such as the one brought in this case."); *Coon v. Willet*

*Dairy, LP*, 2007 WL 2071746, at *7 (N.D.N.Y. July 17, 2007) ("[C]ourts have held that the ECL does not confer a private cause of action.").

## VIII. Plaintiffs' Expert

Defendants move for an order precluding plaintiffs' expert, Mauro M. Gabriele from testifying at trial pursuant to Fed. R.Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Consideration of this motion is necessary before addressing plaintiffs' remaining claim under New York Navigation Law § 181. Defendants specifically seek to preclude Gabriele from testifying to the valuation of plaintiffs' property resulting from the alleged environmental impacts on the property. Gabriele opines the health risks and financial risks resulting from plaintiffs' contaminated property result in a 100% diminution in the property's value.

Rule 702 states a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's testimony (1) is based on sufficient facts or data; (2) is the product of reliable principles and methods; and (3) has reliably applied the principles and methods to the facts of the case. *See* Fed.R.Evid. 702.

Defendants' motion boils down to the argument that Gabriele used a "substitution theory" to determine the impaired value of plaintiffs' environmentally impacted property, which is not an accepted methodology of valuation. According to Gabriele, the substitution theory, as applied to this case, holds if two otherwise identical homes were to appear on the market at the same time, any reasonable purchaser would choose the property without environmental contamination.[2]

---

**2.** Gabriele's "sales comparison approach" used to determine the unimpaired value of

plaintiffs' property (assuming no contamina-

In explaining the basis for this seemingly straightforward theory, plaintiffs point to Gabriele's reliance on an article by William N. Kinnard, Jr., in the July 1999 edition of *The Appraisal Journal.* However, Gabriele testified he did not specifically recall reading the article. Furthermore, it is unclear how helpful this article is. It appears the Kinnard article deals primarily with the appropriate methodology for determining the valuation of impaired commercial property rather than residential property. Also, the article reports that 85% of the appraisers who responded to the author's survey used the sales comparison approach in appraising impaired property. The article does not appear to set forth or support Gabriele's substitution theory.

Gabriele as much as admits his substitution theory is not an accepted valuation methodology. He testified at his deposition that he relied on The Appraisal Institute, *The Appraisal of Real Estate* (13th ed.2008), in preparing his expert report. Gabriele described this book as the "Bible" of appraisal concepts and theory, but conceded the substitution theory was not mentioned as a methodology in the book. In explaining this, Gabriele testified "[u]nfortunately, my peers at The Appraisal Institute recast the Bible on a regular basis, and those of us that are cerebral in the industry have had issues with inclusion of new material and exclusion of old material. . . . I think it is the current most up-to-date, foremost manual on valuation [but] I just don't think it is a perfect document. . . ."

Defendants claim Gabriele did not adhere to the Uniform Standards of Appraisal Practice of the Appraisal Institute ("USPAP") in developing his expert report. Under New York law, every appraisal assignment shall be conducted and communicated in accordance with the provisions and standards set forth in the USPAP. *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 2008 WL 2324112, at *4 (S.D.N.Y. June 5, 2008). USPAP Advisory Opinion 9 ("AO–9") relates to the appraisal of contaminated properties. It does not mention substitution as an appropriate methodology for appraising environmentally impaired property. AO–9 states: "Estimating the effects of environmental contamination on real property value usually involves the application of one or more specialized valuation methods. These methods should be consistent with the requirements related to the valuation approaches in USPAP." Plaintiffs here do not explain how Gabriele followed this advisory opinion, any other aspect of the USPAP, or, generally, any accepted valuation method.

Simply put, plaintiffs have provided the court with no means by which to assess the reliability of their expert's opinion. Accordingly, defendants' motion to preclude Gabriele from testifying to the impaired valuation of plaintiffs' property is granted. *See In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 2008 WL 2324112, at *4.

### IX. *New York's Navigation Law*

Both parties move for summary judgment on plaintiffs' claim under New York Navigation Law § 181. This provision provides that "[a]ny person who has discharged petroleum shall be strictly liable, without regard to fault, for all cleanup and removal costs and all direct and indirect damages, no matter by whom sustained, as defined in this section." N.Y. Nav. L. § 181. Plaintiffs argue defendants are responsible for the discharge of petroleum onto their property and they are entitled to damages for the loss of value in their

tion) is not subject to the present *Daubert* challenge.

property due to the contamination and to attorneys' fees.

Defendants do not dispute the service station is the source of petroleum that eventually contaminated plaintiffs' property. Defendants, Texaco, and Star owned the service station at various times. Motiva has assumed all liability attributable to Texaco and assumed all responsibility for the remediation of plaintiffs' property. Defendants nowhere contest their responsibility for the petroleum contaminating plaintiffs' property, although they do contest that the contamination was the cause of the alleged odors of which plaintiffs complained. Thus, the Court grants plaintiffs' motion for summary judgment and finds defendants are strictly liable under Section 181.

### A. Damages Under Section 181

■ Defendants move for summary judgment on the ground that plaintiffs are not entitled to any damages under Section 181. "The purpose of the statute is, inter alia, to require the prompt cleanup and removal of oil and fuel discharge, to minimize damage to the environment, to restore the environment to its pre-spill condition, and to compensate those damaged by such discharge." *Sunrise Harbor Realty, LLC v. 35th Sunrise Corp.*, 86 A.D.3d 562, 927 N.Y.S.2d 145, 150 (2d Dep't 2011). A party may recover under Section 181 damages consisting of all costs associated with the cleanup and removal of a discharge. *AMCO Intern., Inc. v. Long Island R.R. Co.*, 302 A.D.2d 338, 754 N.Y.S.2d 655, 657 (2d Dep't 2003).

■ Here, defendants have assumed all costs related to the investigation and remediation of plaintiffs' property. Robert Hanna testified he has not incurred any costs related to the investigation or cleanup of his property. However, he testified defendants replaced grass, trees, and shrubs they had removed from his proper-

ty, but claims the trees and shrubs subsequently died and he replaced them. Plaintiffs offer no evidence of how much those replacements cost. He also testified he rebuilt a wall on his property. While plaintiffs have not shown what amount, if any, they are entitled to under Section 181 for the costs associated with defendants' remediation of their property, the Court will not prevent plaintiffs from presenting evidence regarding whatever minimal costs they incurred re-landscaping their property. The Court finds no merit to the contention that plaintiffs are entitled to damages for prospective costs of future monitoring and remediation. *See, e.g., Putnam v. State*, 223 A.D.2d 872, 636 N.Y.S.2d 473, 475 (3d Dep't 1996).

■ "If it is established that despite efforts to clean up property after an oil spill, the premises cannot be restored to their pre-spill condition, 'the proper measure of damages is the total amount of diminution in value plus the costs of repairs.'" *Sunrise Harbor Realty, LLC v. 35th Sunrise Corp.*, 927 N.Y.S.2d at 150. Plaintiffs have not provided the Court with any admissible evidence regarding damages for the diminution in value of their property. Plaintiffs spend much time arguing the extent to which their property is contaminated. However, plaintiffs fail adequately to link this contamination to any measure of damages due to their property's decreased value. Plaintiffs claim the undisputed loss of value to their property is $750,000. However, this valuation is based solely on the opinion of plaintiffs' expert, whose testimony the court has excluded.

Plaintiffs' general claim that the stigma associated with the contamination of their property renders it unmarketable is unavailing. *See AMCO Intern., Inc. v. Long Island R.R. Co.*, 754 N.Y.S.2d at 658 (affirming supreme court's refusal to award damages to plaintiffs "for the alleged per-

manently diminished value of their property due to the stigma of contamination since the evidence did not support such an award"). Plaintiffs point to no other evidence linking the contamination of their property with any diminution property value.

Therefore, the Court finds plaintiffs have raised a genuine issue of material fact as to what damages, if any, they are entitled to under N.Y. Nav. Law § 181 for costs associated with the remediation of their property. However, the Court grants defendants' motion for summary judgment as to plaintiffs' claims for damages regarding the diminution of their property's value.

### B. *Attorneys' Fees*

Plaintiffs move for an award of attorneys' fees under Section 181. Indirect damages under this provision include attorneys' fees incurred by a property owner against the discharger. *See Starnella v. Heat,* 14 A.D.3d 694, 789 N.Y.S.2d 227, 227–28 (2d Dep't.2005). "There is no requirement that to bring an action pursuant to Navigation Law § 181(5), or to recover an attorney's fee thereunder, a plaintiff must have either paid cleanup and removal costs or been held liable to the State for cleanup and removal costs." *Id.* As this motion does not resolve the litigation between the parties, the Court reserves judgment on any award of attorneys' fees.

### CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is DENIED as to their claims regarding (1) statute of limitations, except insofar as the Court grants summary judgment on the ground that only certain of plaintiffs' claims are tolled; (2) negligent infliction of emotional distress; (3) private nuisance; and (4) New York Navigation Law § 181, insofar as plaintiffs are entitled to prove damages for costs associated with the remediation of their property and attorneys' fees. Defendants' motion for summary judgment is GRANTED as to plaintiffs' claims for (1) trespass; (2) public nuisance; (3) violations of New York Environmental Conservation Law § 23–1717; and (4) damages under New York Navigation Law § 181 for diminution in their property's value. Defendants' motion to preclude expert testimony is GRANTED. Plaintiffs' motion for summary judgment is DENIED as to their claim for damages under New York Navigation Law § 181. Plaintiffs' motion is GRANTED as to defendants' statute of limitations defense and as to the issue of liability under New York Navigation Law § 181.

The Clerk is instructed to terminate these motions (Docs. ## 52, 56, 61).

The parties are directed to submit a Joint Pretrial Order in accordance with the Court's Individual Practices by April 9, 2012.

Counsel are directed to appear for a pretrial conference on April 17, 2012, at 10:00 a.m.