JACOBS, Circuit Judge:
Davino Watson, a United States citizen, was held in immigration custody for three- and-a-half years on the mistaken belief that he was a deportable alien. He sued under the Federal Tort Claims Act (the “FTCA”) in the United States District Court for the Eastern District of New York (Weinstein, Ji), asserting false imprisonment, malicious prosecution, and two negligence claims. One negligence claim is that immigration officials conducted a negligent investigation into Watson’s citizenship status; the other is that the government negligently failed to deliver a certificate of citizenship to Watson in a timely manner.[1]
After a bench trial, the district court found the government liable on the false imprisonment claim, though the district court limited damages to the first twenty-seven days of Watson’s detention. The district court had previously dismissed on motion the malicious prosecution claim as barred by 28 U.S.C. § 2680(h), as well as the negligent investigation claim for want of a state-law analogue. After trial, the district court entered judgment against Watson on his claim that the government negligently delayed delivery of his certificate of citizenship, concluding that Watson had not demonstrated negligence and had suffered no damages.
Watson appeals the adverse rulings on his malicious prosecution claim and both negligence claims, and also appeals the district court’s decision to limit the government’s damages on the false imprisonment claim. The government cross-appeals the *127 district court’s judgment on the false imprisonment claim, contending that the claim is time-barred by the FTCA’s two-year statute of limitations.
It is arresting and disturbing that an American citizen was detained for years in immigration proceedings while facing deportation, but Watson’s claims for damages are foreclosed by precedent. Watson’s false imprisonment claim is untimely, and we reverse the judgment to that extent. We otherwise affirm. Watson’s malicious prosecution claim fails because no government official acted with malice; his negligent investigation claim fails because there is no analogous tort under New York law, as required by the FTCA; and his claim that the government negligently delayed delivery of his certificate of citizenship fails because Watson did not suffer cognizable damages.
In sum, we reverse the judgment of the district court on the false imprisonment claim, affirm the judgment in all other respects, and dismiss as moot Watson’s appeal from the limitation on damages for false imprisonment.
I
At the time of his birth in Jamaica, neither of Watson’s parents were U.S. citizens. When Watson was thirteen years old in 1998, he entered the United States as a lawful permanent resident to live with his father, who was then a lawful permanent resident of the United States. Watson’s father was naturalized on September 17, 2002, and there is no longer any dispute that Watson automatically became a U.S. citizen at the same time as his father. However, for most of the relevant period, the government had reason to believe that Watson was not a U.S. citizen. As will be shown, that misunderstanding resulted in part from the fact that Watson’s father (Hopeton Ulando Watson) and his mother (Dorette McFarlane) never married. The relevant statutes governing Watson’s citizenship status are set out in the margin.[2]
A
In 2007, Watson pleaded guilty in New York state court to selling cocaine. While serving his prison sentence, Immigration and Customs Enforcement (“ICE”) agents investigated Watson’s citizenship status to determine whether he was deportable.
The investigation was beset by errors. From the beginning, ICE agents were presented with information strongly suggesting that Watson was a citizen based on his father’s naturalization, but the agents did not competently pursue the leads. For example, during Watson’s first interview with ICE, he claimed U.S. citizenship, told the ICE agents the names of *128 his father and step-mother, and gave their telephone number to assist the investigation. The ICE agents did not call the telephone number, despite writing a note to do so in order “to verify status.” App’x at 206, 500. There may be reason to suspect a proffered phone number, but the call was never made, even though Watson’s pre-sentencing report, a copy of which ICE received, indicated that he was a U.S. citizen, listed the names of his father and step-mother, and gave the same phone number that Watson had provided.
Although they did not call his father and step-mother, ICE agents did attempt to learn more about them as part of the investigation into Watson’s citizenship. Importantly, Watson’s father’s name is “Hopeton Ulando Watson” and his stepmother’s name is “Clare Watson.”[3] When ICE agents searched an ICE database for “Hopeton Watson” and “Clare Watson,” they found a “Hopeton Livingston Watson” and a “Calrie Watson.” Because these two persons were born in Jamaica and lived near New York, ICE agents assumed that they were Watson’s parents.
The agents might be forgiven for making that assumption: “Hopeton” might seém like an unusual name, and “Calrie” is within a typo of “Clare.” But the ICE agents also ignored or failed to recognize flags that these people were not related to Watson. Aside from the fact that Hopeton Livingston Watson had the wrong middle name, his file also reflected that he lived in Connecticut (rather than New York), did not have a child named Davino, and became a lawful permanent resident three years after the date of Davino Watson’s lawful permanent residency. Evidently, the ICE officers also failed to look at the affidavit that Watson’s actual father (Hopeton Ulando Watson) had 'submitted in connection with Davino’s application for legal permanent residency in 1998. That affidavit contained Hopeton Ulando Watson’s date of birth, alien number, and social security number, none of which matched the corresponding file data for Hopeton Livingston Watson.
Nonetheless, the government assumed that Hopeton Livingston Watson was Da-vino’s father. And since Hopeton Livingston Watson was not a citizen, ICE agents believed that Watson similarly lacked citizenship and was subject to deportation.
A supervisory ICE officer, relying on this conclusion without undertaking more investigation, drafted a “Notice to Appear,” which initiates deportation proceedings. In the words of the district court, another supervisory officer “mindlessly signed” the Notice to Appear and forwarded it to the ICE office responsible for taking Watson into custody.
B
After Watson completed his state prison sentence, he was arrested by ICE agents, and placed in custody despite Watson’s insistence that he was a citizen. Watson’s Notice to Appear was formally filed nineteen days later, and he first appeared before an immigration judge about one month afterward.
C
Watson actively sought to prove his citizenship throughout his immigration detention. Early on, he applied to the United States Citizenship and Immigration Services (“USCIS”) for a certificate of citizenship (a document that evidences the bear *129 er’s U.S. citizenship). USCIS denied his request on the basis of In re Hines, 24 I. & N. Dec. 544 (BIA 2008), decided by the Board of . Immigration Appeals (“BIA”) twenty-eight days after Watson was detained.
Hines dealt with the requisites of “legitimation” under Jamaican law. That issue, was critical to Watson because he could derive citizenship from his father only if he had been “legitimated” by his father. See 8 U.S.C. §§ 1101(c)(1), 1481(a). In Hines, the BIA stated that it “will deem a child born out of wedlock in Jamaica to have had his or her paternity established ‘by legitimation’ only upon proof that the child’s parents married at some time after the child’s birth.” 24 I. & N. Dec. at 548. Because Watson’s parents never married, he was not deemed to have been “legitimated,” and consequently was ineligible for derivative citizenship under the BIA’s then-current interpretation of Jamaican law. Ultimately, Hines led to the denial of Watson’s application for a certificate of citizenship by USCIS, the issuance of an order of removal by the immigration judge, and the affirmance of Watson’s order of removal by the BIA.
D
In a prior appeal, Watson petitioned this Court to review the immigration judge’s order of removal. We denied his petition, but in so doing we declined to consider whether the BIA correctly concluded that Watson had not been “legitimated;” rather, we relied on the BIA’s alternative ruling that Watson had not produced evidence showing that his father had legal custody over him, which would preclude derivative citizenship regardless of legitimation. See 8 U.S.C. § 1481(a)(3). However, after Watson filed an emergency petition in this Court, we recalled our mandate and reinstated Watson’s original petition. We then asked the BIA to clarify and justify its “legitimation” analysis. Watson v. Holder, 643 F.3d 367 (2d Cir. 2011) (per curiam).
After our remand, ICE apparently began to suspect that Hines might not apply to Watson, and that Watson might be a U.S. citizen under the BIA’s pre-Hines precedent. The government’s precise views on the application of Hines to Watson’s case are somewhat obscure.[4] In any event, ICE released Watson in November 2011 into rural Alabama (where he knew nobody), without money, and without being told the reason for his release. Removal proceedings technically continued for more than a year, ending at last when the BIA, responding to this Court’s remand, issued an unpublished decision concluding that Hines did not apply to Watson’s case. The BIA determined that Watson “was legitimated” under Jamaican law, deduced that *130 Watson “derived citizenship through his father’s naturalization,” and accordingly terminated Watson’s removal proceedings. App’x at 457.
Watson later moved to reopen his application for a certifícate of citizenship, which he received after a long delay. The certifí-cate states that Watson has been a citizen since the date of his father’s naturalization.
E
Watson filed an administrative claim for damages with DHS on October 30, 2018, which was denied approximately one year later. He initiated this lawsuit in the Eastern District of New York on October 31, 2014.
II
The district court found the government liable to Watson on his claim of false imprisonment. The government’s argument that the claim was untimely was rejected on alternative grounds. First, the court ruled that the statute of limitations for the false imprisonment did not begin to run until the day Watson received his certificate of citizenship (November 26, 2013). Second, even if Watson’s claims were filed after the limitations period had expired, the district court ruled that Watson would be entitled to equitable tolling until the day that Watson was informed by his lawyer of his right to bring an FTCA claim (July 31, 2014). Since both events postdated the filing of Watson’s administrative claim, the false imprisonment claim would be timely.
We disagree. Watson’s false imprisonment claim is untimely, and the judgment of the district court is reversed to the extent it held the government liable on Watson’s false imprisonment claim.
A
Watson brought his claim pursuant to the FTCA, which imposes a two-year statute of limitations:
A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues....
28 U.S.C. § 2401(b). Since Watson’s administrative claim for false imprisonment was filed on October 30, 2013, it is untimely if it accrued before October 30, 2011. The question, then, is when Watson’s claim accrued.[5]
The district court (erroneously) held that this question was governed by Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994).[6] But Watson concedes on appeal (and we agree) that the proper framework is provided by Wallace v. Kato, 549 U.S. 384, 127 S.Ct. 1091, 166 *131 L.Ed.2d 973 (2007). Wallace held that “[limitations begin to run against an action for false imprisonment when the alleged false imprisonment ends.” Id. at 389, 127 S.Ct. 1091 (quoting 2 H. Wood, Limitations of Actions § 187d(4), p. 878 (rev. 4th ed. 1916)). It is of course possible for the tort of “false imprisonment” to end while physical detention continues. That is so because of the distinction between the tort of false imprisonment and the tort of malicious prosecution: false imprisonment is characterized by “detention without legal ’process,” while malicious prosecution involves detention resulting from “wrongful institution of legal process.” Id. at 389-90, 127 S.Ct. 1091 (emphases in original). “[F]alse imprisonment ends once the victim becomes held pursuant to such process—when, for example, he is bound over by a magistrate or arraigned on charges.” Id. at 389, 127 S.Ct. 1091 (emphasis in original). “Thereafter, unlawful detention forms part of the damages for the ‘entirely distinct’ tort of malicious prosecution.” Id. at 390, 127 S.Ct. 1091 (quoting W. Keeton et al., Prosser & Keeton on Law of Torts § 119, p. 885-86 (5th ed. 1984)). In short, a false imprisonment claim starts to run when a detainee begins to be held pursuant to legal process.
The timeliness of Watson’s claim therefore depends on when he began to be held pursuant to legal process. There are several potential dates, including the day Watson was served with a “Notice to Appear” (which starts removal proceedings), and the day Watson first appeared before an immigration judge.
But we need not decide the precise date on which Watson was first held pursuant to legal process because we conclude that Watson was certainly held pursuant to such process by the time an immigration judge ordered Watson’s removal, which occurred on November 13, 2008.[7] By that point, Watson and the government had filed opposing briefs on removability, and the immigration judge weighed the arguments and ruled against Watson, thereby affirming the government’s right to detain him. The Supreme Court has indicated that a cause of action for false imprisonment begins at least by the point a criminal defendant is arraigned on charges, see Wallace, 549 U.S. at 391, 127 S.Ct. 1091, and by November 13, 2008, Watson had gone through an entire trial-like proceeding to determine the lawfulness of his detention. Because that date occurred more than two years before Watson filed his administrative claim, his cause of action is untimely.[8]
B
Alternatively, the district court ruled that Watson’s claims were timely on the ground of equitable tolling. In these circumstances, we review the district court’s decision to allow equitable tolling for abuse of discretion. See Phillips v. Generations Family Health Ctr., 723 F.3d 144, 149 (2d Cir. 2013).
*132 “Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way.” Mottahedeh v. United States, 794 F.3d 347, 352 (2d Cir. 2015) (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005)). In this appeal, the second element is decisive.
Watson’s case is certainly extraordinary in a number of unfortunate ways. However, “[t]he term ‘extraordinary1 refers not to the uniqueness of a party’s circumstances, but rather to the severity of the obstacle impeding compliance with a limitations period.” Harper v. Ercole, 648 F.3d 132, 137 (2d Cir. 2011). So: “[t]o secure equitable tolling, it is not enough for a party to show that he experienced extraordinary circumstances. He must further demqnstrate that those circumstances caused him to miss the original filing deadline.” Id. (emphasis added).
The district court’s grant of equitable tolling was based on Watson’s lack of education and legal training, his unawareness that he could bring an FTCA claim until being advised by appointed counsel, his depression, and “most significantly,” the fact that government officials told Watson that he was not a U.S. citizen. App’x at 181-82. None of those reasons justifies equitable tolling.
We begin with the circumstance emphasized by the district court (and by Watson on appeal), that “the government actively and repeatedly insisted ... that he was not a citizen, which made it more difficult for Watson to recognize his FTCA cause of action.” Watson’s Reply Br. at 35. But making it “more difficult” for Watson to assert his false imprisonment claim is insufficient. Rather, Watson must demonstrate that the government’s assertion of his alien status was a sufficiently “severe” obstacle that “caused” him to miss his filing deadline. Harper, 648 F.3d at 137.
Watson’s own actions foreclose the argument. He mounted a vigorous case in the immigration court in the effort to prevent deportation: he obtained copies of important documents supporting his claim to citizenship, presented those documents to the immigration judge and other officials, filed a pro se motion to terminate his removal proceedings, and responded to the government’s brief in opposition. During his detention, Watson also applied to US-CIS for a certificate of citizenship, proffering documents in support of his claim of derivative citizenship.
The government’s assertion of Watson’s alienage could not have been so disheartening as to preclude him from filing an administrative claim for damages while (at the same time) it did not inhibit him from contesting his citizenship in an immigration proceeding based on identical facts. The government’s position therefore did not “cause[ ] him to miss the original filing deadline” for his administrative claim. Harper, 648 F.3d at 137.
It is harsh to place the burden on Watson to file a claim for damages while he is in immigration detention and fighting to prevent his deportation. But the Supreme Court has stated: ‘We know of no support ... for the far-reaching proposition that equitable tolling is appropriate to avoid the risk of concurrent litigation.” Wallace, 549 U.S. at 396, 127 S.Ct. 1091. The facts of Wallace are demonstrative. Arrested by Chicago police in 1994, Wallace confessed to murder while in police custody. Id. at 386, 127 S.Ct. 1091. Years later, Illinois state appellate courts vacated the conviction because Wallace had been arrested without probable cause. Prosecutors dropped charges in 2002, and a year later Wallace filed a § 1983 suit seeking dam *133 ages for false imprisonment. Id. at 387, 127 S.Ct. 1091. The Supreme Court held that the claim for false imprisonment accrued when Wallace appeared before a magistrate, and because that occurred (many) more than two years before he filed suit, his claim was untimely.[9] Id. at 391-92, 127 S.Ct. 1091. Equitable tolling was rejected notwithstanding that Wallace was either awaiting trial or was imprisoned pursuant to a then-valid conviction throughout that two-year period. Id. at 396-97, 127 S.Ct. 1091. Equitable tolling was not warranted even though a district court would have stayed or dismissed Wallace’s suit pursuant to Heck if Wallace had filed his tort claim before his conviction had been overturned. Id. at 396-97, 127 S.Ct. 1091. In light of Wallace, we cannot justify the grant of equitable tolling to Watson on the ground that he was (however understandably) focused on avoiding deportation before filing his claim for administrative damages.
Watson’s depression cannot justify equitable tolling for similar reasons. Depression did not prevent him from contesting his citizenship before the immigration judge, so it could not have prevented him from filing his administrative claim for damages.
Nor can equitable tolling be premised on Watson’s lack of education, pro se status, or ignorance of the right to bring a claim. See, e.g., Menominee Indian Tribe v. United States, — U.S. —, 136 S.Ct. 750, 756-57, 193 L.Ed.2d 652 (2016) (tribe’s mistake of law did not constitute extraordinary circumstance sufficient to justify equitable tolling); Smith v. McGinnis, 208 F.3d 13, 18 (2d Cir. 2000) (habeas petitioner’s “pro se status ... does not merit equitable tolling”). “Equitable tolling is a rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs.”[10] Wallace, 549 U.S. at 396, 127 S.Ct. 1091.
In sum, Watson’s false imprisonment claim was untimely and cannot be saved by equitable tolling. We therefore grant the cross-appeal of the United States on this issue and reverse the judgment of the district court with respect to the government’s liability on Watson’s false imprisonment claim.
Ill
The district court dismissed Watson’s malicious prosecution claim on motion, concluding that the cause of action was foreclosed by 28 U.S.C. § 2680(h), which bars FTCA claims that arise out of malicious prosecution unless certain exceptions apply. App’x at 135. One such exception is a claim for malicious prosecution “with regard to acts or omissions of investigative or law enforcement officers of the United States government.” 28 U.S.C. § 2680(h). Watson argues that the district court failed to recognize that his malicious prosecution claim was based on acts and omissions by ICE and DHS officers, who (Watson contends) are “investigative or *134 law enforcement officers” within the meaning of § 2680(h). Though Watson is correct on this point, see Liranzo v. United States, 690 F.3d 78, 91 (2d Cir. 2012), the district court’s factual findings are fatal to his claim.
To recover under the FTCA, a plaintiff must show that a government employee committed a tort “under eircum-stances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.” 28 U.S.C. § 1346(b)(1); see also 28 U.S.C. § 2674. The parties agree that New York law applies to this appeal. In New York, the elements of malicious prosecution are: “(1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice.” Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003).
As the New York Court of Appeals has recently reaffirmed, the tort of malicious prosecution requires proof of both malice and a lack of probable cause, which are “independent and indispensable elements.” Torres v. Jones, 26 N.Y.3d 742, 761, 47 N.E.3d 747 (2016) (quoting Martin v. City of Albany, 42 N.Y.2d 13, 17, 396 N.Y.S.2d 612, 364 N.E.2d 1304 (1977)). To prove malice, a plaintiff must show that the defendant acted in bad faith, i.e., on the basis of “a wrong or improper motive, something other than a desire to see the ends of justice served.” Id. (quoting Nardelli v. Stamberg, 44 N.Y.2d 500, 503, 406 N.Y.S.2d 443, 377 N.E.2d 975 (1978)). After a bench trial on liability with respect to the claims that survived dismissal, the district court found that Watson’s “harm was caused by a series of negligent acts by government officials,” and that “[t]here is no evidence of malice or intent to harm plaintiff.” App’x at 226. Because Watson cannot demonstrate malice under New York law, his malicious prosecution claim fails.
IV
Watson asserts two distinct claims of negligence. The first claim is that ICE agents negligently failed to comply with internal regulations for how to investigate a suspected alien’s assertion of U.S. citizenship. The district court dismissed, reasoning that Watson was essentially arguing that ICE agents conducted a “negligent investigation,” which is not actionable under New York tort law. We review that decision de novo. Fountain v. Karim, 838 F.3d 129, 134 (2d Cir. 2016).
Under the FTCA’s private analogue requirement, see 28 U.S.C. § 1346(b)(1), “a plaintiffs cause of action must be comparable to a cause of action against a private citizen recognized in the jurisdiction where the tort occurred.” McGowan v. United States, 825 F.3d 118, 125 (2d Cir. 2016) (internal quotation marks omitted). And “[u]nder New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution.” Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994).
Watson concedes that there is no New York tort of negligent investigation, but contends that he is asserting the distinct claim that Watson’s injury was caused by the failure of ICE to follow its own internal directives. A similar re-characterization was attempted in McGowan; like the plaintiff in McGowan, Watson has “failed to establish that New York law recognizes a freestanding duty to abide by private regulations.” 825 F.3d at 127. Although failure to abide by internal regulations may “constitute! ] evidence of *135 negligence,” it does not demonstrate “negligence in itself.” Id. (emphasis in original). Because New York does not recognize a duty to follow private regulations, Watson cannot ground his negligence claim on ICE’s failure to follow its own directives regarding how to pursue an investigation into a subject’s citizenship.[11]
This negligence claim consequently fails for lack of a private analogue, and we affirm the district court’s dismissal of that claim.
y
Watson asserts that USCIS negligently delayed providing him with his certificate of citizenship for more than two years after he was released from custody. After a bench trial, the district court entered judgment for the government for two independent reasons. First, Watson failed to demonstrate that the government acted negligently. Second, “[e]ven if a duty of care was violated ..., plaintiff failed to satisfy his burden of establishing damages caused by the breach.” App’x at 231.
Specifically, with respect to damages, the district court found that Watson’s “inability to secure work was a result of his criminal history, drug use, and general lassitude, not his immigration status,” and that there is “no credible evidence that plaintiffs post-release depression was caused by the government’s failure to provide a certificate of citizenship earlier than it did.” Id. Without challenging those findings, Watson argues that the district court found that Watson had suffered other cognizable harm as a result of his delay in receiving his certificate of citizenship.
Watson evidently relies on the district court’s “Alternative Damages Award,” in which the district court provided for conditional damages “in the event that the Court of Appeals concludes th[e] [district] court erred in limiting damages to ... false imprisonment.” App’x at 242. With respect to Watson’s claim for negligent delay of his certificate of citizenship, the Alternative Damages Award stated that: “If plaintiff is entitled to damages for the period between his release from ICE custody and his receipt of a certificate of citizenship, he would be entitled to $1,000 per day for what amounts to a constructive limitation on his liberty, and an additional $250 per day for the emotional injury caused by the government’s failure to timely provide the certificate.” Id. (emphasis added). Watson contends that this passage is an implicit finding that Watson did suffer cognizable damage as a result of the delayed delivery of the certificate, of a nature (emotional damages and a constructive limitation on liberty) distinct from the damages the district court found unavailable in its primary finding on damages (i.e., that Watson could not show damages for depression or lost income).
We disagree with Watson’s reading of the district court’s order. The district court was quite clear that Watson’s failure to demonstrate damages was a complete bar to recovery on his negligent delay claim: “[e]ven if a duty of care was violated by the time it took to issue a certificate of citizenship, plaintiff failed to satisfy his burden of establishing damages caused by the breach.” App’x at 231. The district court ordered damages to be awarded in the alternative only if we disagree with the district court’s threshold *136 conclusion that Watson had failed to prove damages; we do not.
Accordingly, we affirm the district court’s determination with respect to Watson’s second negligence claim.[12]
CONCLUSION
In sum, there is no doubt that the government botched the investigation into Watson’s assertion of citizenship, and that as a result a U.S. citizen was held for years in immigration detention and was nearly deported. Nonetheless, we must conclude that Watson is not entitled to damages from the government. His false imprisonment claim was untimely, his malicious prosecution claim does not demonstrate malice, his “negligent investigation” claim fails for lack of a proper analogue in state law, and his claim for negligent delivery of a certificate of citizenship fails because Watson could not show cognizable damages.
Accordingly, the judgment of the district court is reversed on the false imprisonment claim and affirmed in all other respects. Watson’s appeal regarding the amount of damages for false imprisonment is dismissed as moot.

. Watson also brought two claims pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), which the district court dismissed. Watson does not challenge that ruling on appeal.

. A child born outside of the United States automatically becomes a citizen of the United States when all of the following conditions have been fulfilled:
(1) At least one parent of the child is a citizen of the United States, whether by birth or naturalization.
(2) The child is under the age of eighteen years.
(3) The child is residing in the United States in the legal and physical custody of the citizen parent pursuant to a lawful admission for permanent residence.
8 U.S.C. § 1431(a). For purposes of that provision, "child” is defined as:
an unmarried person under twenty-one years of age and includes a child legitimated under the law of the child’s residence or domicile, or under the law of the father’s residence or domicile, whether in the United States or elsewhere, ... if such legitimation ... takes place before the child reaches the age of 16 years ... and the child is in the legal custody of the legitimating ... parent ... at the time of such legitimation. ...
8 U.S.C. § 1101(c)(1).

. When ICE agents asked Watson for his mother’s name, he apparently gave them the name of his step-mother.

. Shortly before Watson was released from custody, an ICE memo suggested that Hines should not be applied retroactively. If so, Watson would be a citizen because, under the pre-Hines precedent In re Clahar, 18 I. & N. Dec. 1 (BIA 1981), Watson would have been deemed legitimate pursuant to the BIA’s interpretation of Jamaican law. App’x at 402-03. The BIA did not appear to rely on that reasoning when it formally terminated Watson’s removal proceedings more than a year later. Instead, the BIA's unpublished opinion reasoned that Hines dealt with the statutory phrase "paternity by legitimation,” and thus did not implicate the statutory term "legitimated,” which was the relevant term in Watson’s case. App’x at 457; see also 8 U.S.C. § 1432(a)(3) (2000), repealed by Child Citizenship Act of 2000, Pub. L. No. 106-395, § 103, 114 Stat. 1632-33. In any event, the government conceded that Watson had been "legitimated” under Jamaican law, and the BIA concluded that Watson consequently "derived citizenship through his father’s naturalization.” App'x at 457. The BIA’s shifting interpretations of Jamaican law did not end, however: it has since overruled Hines in its entirety, returning to the interpretation first expressed in Clahar. See In re Cross, 26 I. & N. Dec. 485, 485-86 (BIA 2015).

. The district court’s denial of the government’s motion for summary judgment based on the claim’s accrual date is reviewed de novo. See Buttry v. Gen. Signal Corp., 68 F.3d 1488, 1492 (2d Cir. 1995).

. In Heck, the Supreme Court held that a prisoner cannot bring a claim against the government "for allegedly unconstitutional conviction or imprisonment” unless the plaintiff can prove that the "conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.” Id. at 486-87, 114 S.Ct. 2364. In light of that ruling, the Supreme Court further held that “a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated.” Id. at 489-90, 114 S.Ct. 2364. Analogizing to Heck, the district court determined that Watson’s false imprisonment claim did not accrue until he received his certificate of citizenship on November 26, 2013.

. It bears emphasis that legal process may attach prior to an immigration judge's determination of removability.

. Watson also contends that, since he was a U.S. citizen, he was not subject to “legal process” because immigration judges lack jurisdiction to' conduct removal proceedings against U.S. citizens. He cites Ng Fung Ho v. White, 259 U.S. 276, 284, 42 S.Ct. 492, 66 L.Ed. 938 (1922): “Jurisdiction in the executive to order deportation exists only if the person arrested is an alien. The claim of citizenship is thus a denial of an essential jurisdictional fact.” Nevertheless, an immigration judge has jurisdiction to consider a person’s claim to citizenship when the government alleges the person is an alien; and such jurisdiction is sufficient to allow legal process to begin.

. The Supreme Court did allow tolling for the time period that Wallace was a minor. Wallace, 549 U.S. at 390, 127 S.Ct. 1091. Such tolling is distinct from equitable tolling, and has no application to this case.

. The dissent thrice adverts to this quoted passage, -drawing the invalid inference that the majority deems the multi-year detention of an American citizen as an "entirely common state of affairs.” Dissent at 136, 145, 147. What is "an entirely common sate of affairs” is Watson’s 11th-grade education and the corollary that he lacks knowledge of the law. The dissent would rely on those characteristics to toll the limitations period. But those characteristics, commonplace for pro se litigants (and for a substantial segment of the population), are wholly insufficient to justify the "rare remedy” of equitable tolling. Wallace, 549 U.S. at 396, 127 S.Ct. 1091.

. Watson also contends that this negligence claim is partially based on the government’s "failure to act.” Watson's Reply Br. at 24. But the "failure to act” that Watson alleges is simply a failure to conduct a non-negligent investigation. New York law does not recognize such a fort. Bernard, 25 F.3d at 102.

. In light of our disposition, we have no need to consider the district court's conclusion that Watson’s negligence claim was sufficiently analogous to a claim recognized by New York tort law to survive the FTCA’s private analogue requirement.