16-2592-cv
*Bethpage Water Dist. v. Northrop Grumman Corp., Northrop Grumman Systems Corp.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————————

August Term 2017

(Argued:  September 29, 2017      Decided:  March 2, 2018)

Docket No. 16-2592-cv

———————————————

BETHPAGE WATER DISTRICT,

*Plaintiff-Appellant,*

v.

NORTHROP GRUMMAN CORPORATION,
NORTHROP GRUMMAN SYSTEMS CORPORATION,

*Defendants-Appellees.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

———————————————

Before:

CHIN and DRONEY, *Circuit Judges*, and RESTANI, *Judge.*[*]

———————————————

[*] Judge Jane A. Restani, United States Court of International Trade, sitting by designation.

Appeal from a judgment of the United States District Court for the Eastern District of New York (Feuerstein, *J.*), entered pursuant to an order granting a motion for partial summary judgment dismissing plaintiff-appellant's claims of nuisance, trespass, and negligence arising from water contamination as barred by the statute of limitations.

AFFIRMED.

———————————

ALANI GOLANSKI (Curt D. Marshall, Robin L. Greenwald, *on the brief*), Weitz & Luxenberg, P.C., New York, New York, *for Plaintiff-Appellant Bethpage Water District*.

MARK A. CHERTOK (Elizabeth Knauer, Adam Stolorow, Victoria S. Treanor, *on the brief*), Sive, Paget & Riesel, P.C., New York, New York, *for Defendants-Appellees Northrop Grumman Corporation, Northrop Grumman Systems Corporation*.

———————————

CHIN, *Circuit Judge*:

This case involves drinking water contamination caused by the activities of defendants-appellees Northrop Grumman Corporation and Northrop Grumman Systems Corporation (together, "Northrop Grumman") in

Bethpage, Long Island. Plaintiff-appellant Bethpage Water District (the "District") sued Northrop Grumman below for negligence, trespass, and nuisance based on groundwater contamination in Bethpage, and seeks damages for the cost of remediation.

Northrop Grumman filed a motion for partial summary judgment, arguing that the District's claims are barred by the three-year statute of limitations found in N.Y. C.P.L.R. § 214-c(2), which governs pollution claims. The magistrate judge (Shields, *J.*) issued a report and recommendation ("R&R") recommending that the motion be granted. The district court (Feuerstein, *J.*) adopted the R&R.

On appeal, the principal question is when a cause of action for groundwater pollution accrues, so as to trigger the statute of limitations. Northrop Grumman argues that a cause of action accrues when the water provider learns that contamination threatens water quality to such an extent that remedial action must be promptly taken, even if the contamination has not yet reached the water source. The District argues that the statute of limitations does not accrue until contamination is actually detected in the water source itself. We

affirm the decision of the district court and hold that the District's claims are time-barred.

*BACKGROUND*

**A.** *Facts*

**1.** **The Pollution and Threat to the District**

The District provides drinking water to the residents of the Town of Bethpage ("Bethpage") and its environs from the Long Island Aquifer System. Because the Long Island Aquifer System is the principal drinking water source for the area, it has been classified as a "sole source" aquifer under the Safe Drinking Water Act, 42 U.S.C. § 300f. Although the District employs eight different wells to provide drinking water, only two wells are at issue in this suit: Well 4-1 and Well 4-2 located at Plant 4.

Beginning in the 1930s, the Grumman Corporation ("Grumman") conducted manufacturing activities on its 600-acre property in Bethpage (the "Property"), including manufacturing heavy industrial and military equipment during World War II. In 1994, Grumman was bought by Northrop Corporation.

At some point, volatile organic compounds ("VOCs") from Grumman's property began to contaminate the groundwater in Bethpage. The

-4-

primary VOC contaminating the water was trichloroethylene ("TCE"), which has been linked to liver problems and is a possible carcinogen.[1] The Maximum Contaminant Level ("MCL") for TCE is 5 µg/L (micrograms per liter).[2] There are three different sites involved in this litigation, known as "Operable Units."[3]

### a. Operable Units One and Two

In 1983, the New York State Department of Environmental Conservation ("DEC") listed the Property, known as the Grumman Aeropsace-Bethpage Facility Site, in the Registry of Inactive Hazardous Waste Disposal Sites.

In 1990, Grumman entered into a Consent Order with DEC to conduct a Remedial Investigation/Feasibility Study ("RI/FS") to analyze

---

[1]  *See* EPA, *National Primary Drinking Water Regulations* (2009), https://www.epa.gov/sites/production/files/2016-06/documents/npwdr_complete_table.pdf.

[2]  "Maximum Contaminant Levels" are federally set maximum allowable concentrations of contaminants in drinking water and are set "as close to the health goals as possible, considering cost, benefits and the ability of public water systems to detect and remove contaminants using suitable treatment technologies."  EPA, *What are EPA's Drinking Water Regulations for Trichloroethylene?*, https://safewater.zendesk.com/hc/en-us/articles/212075407-4-What-are-EPA-s-drinking-water-regulations-for-trichloroethylene (last visited Feb. 28, 2017).

[3]  An Operable Unit "represents a portion of a remedial program for a site that for technical or administrative reasons can be addressed separately to investigate, eliminate or mitigate a release, threat of release or exposure pathway resulting from the site contamination."  App. at 636.

contamination at the Property.[4]  As part of the RI/FS process, DEC identified two sites of contamination: (1) the Property, which it designated as Operable Unit 1 ("OU1"), and (2) the plume of contamination associated with the Property, which it designated as Operable Unit 2 ("OU2").

In 1994, the District and Grumman entered into a tolling agreement (the "1994 Agreement") to address VOC contamination from OU1 and OU2 in Well 4-1 and Well 4-2 at Plant 4.  In the 1994 Agreement, Grumman admitted that the "source of the contaminants" at Plant 4 was "located on property owned by Grumman."  The Agreement also provided that:

> (1) Grumman would pay $1.5 million for an air stripping tower ("AST")[5] to remove VOCs and protect Plant 4, up to a concentration of 600 parts per billion ("ppb") total VOCs, and
>
> (2) The District would not make any further demand for pollution remediation at Plant 4 for "contaminants identified to date."  App. 16.

---

[4]    A Remedial Investigation is conducted to ascertain the nature and extent of the contamination, and a Feasibility Study is designed to determine remedies for the contamination.  *See* N.Y. Dep't of Envtl. Conservation, *Remedial Investigation/Feasibility Study*, http://www.dec.ny.gov/chemical/8658.html (last visited Dec. 7, 2017).

[5]    Air stripping is the process of removing VOCs from contaminated groundwater or surface water by moving air through the water.  Because VOCs evaporate easily, the air passing through the contaminated water accelerates the removal of the VOCs.  Air stripping is usually performed by use of an air stripper or an aeration tank.  *See* EPA, *A Citizen's Guide to Air Stripping*, https://www3.epa.gov/region9/superfund/montrose/pdf/outreach/air-stripping.pdf.

The following forms of damages were expressly *excluded* from the Agreement:

> (1)   any damages incurred by the District for migration of the existing contamination;
>
> (2)   any damages incurred by the District caused by the discovery of "new contaminants or an increase in the present levels of the already identified contaminants to a total of 600 [ppb], excluding pollution from sources other than Grumman," App. 15;
>
> (3)   any additional costs incurred by the District if the ASTs "become obsolete or require modifications" to address "new drinking water standards," App. 15;
>
> (4)   any damages from "the discovery of contaminants in any other part of the Water District not already described," App. 15; and
>
> (5)   any damages arising from contamination covered by the Agreement, incurred by the District as a result of "government remediation programs," App. 15.

   b.   **Operable Unit Three**

In October 1962, Grumman donated approximately 12 acres of land to the Town, including 3.75 acres that were used between 1949 and 1962 as settling ponds to "dewater . . . sludge, including neutraliz[ing] chromic acid waste, from the waste water treatment facility" located at the Property.  App. 635.

After contamination from the area was found to threaten groundwater, DEC designated the parcel as Operable Unit ("OU 3") in 2005.

**2.    Remedial Actions**

Northrop Grumman's argument turns on when the pollution was detected in the groundwater and the subsequent actions taken by the District to address the threat of pollution.  Between June 2007 and February 2013, the threat of groundwater pollution generated a great deal of activity, much of it on the part of the District.

**a.    Soil Sampling**

Beginning in 2007, soil samples taken by environmental consultants indicated the existence and extent of the contamination.

**i.    Vertical Profile Boring 104**

In June 2007, Northrop Grumman's consultant Arcadis took groundwater samples from Vertical Profile Boring 104 ("VPB-104"),[6] which showed VOC contamination at 6,300 μg/L threatening the water in Well 4-1 and

---

[6]    Vertical profile boring involves drilling holes into the ground to obtain groundwater and soil samples used to determine the presence of contamination.  *See generally Minn. Stormwater Manual, Understanding and Interpreting Soils and Soil Boring Reports for Infiltration BMPs*, https://stormwater.pca.state.mn.us/index.php?title= Understanding_and_interpreting_soils_and_soil_boring_reports_for_infiltration_BMPs (last modified Feb. 13, 2017).

Well 4-2. On June 19, 2007, the District's engineers, H2M Engineers and Architects ("H2M"), sent an email to DEC stating that VPB-104 results showed "another apparently massive plume" of contamination. App. 1273 ¶ 29. On July 10, 2007, H2M sent a letter to DEC stating that the groundwater contamination from VPB-104 was related to OU3, and asking DEC to investigate the new plume because the "imminent threat of groundwater contamination to public supply wells . . . would likely exceed the existing treatment system capacity at Plant 4." App. 1273 ¶ 31. By October 30, 2007, H2M was so concerned about the "excessive contamination" at VPB-104 that it informed DEC that if the contamination reached the wells, "the existing treatment system would be rendered ineffective." App. 1273 ¶ 32.

## ii. Vertical Profile Boring 116

In a letter to DEC dated April 28, 2008, H2M described VOC contamination found on April 8, 2008 in a new VPB test, VPB-116, as being in the "heart of the screen zone" for Well 4-1 and Well 4-2, and noted that contamination at 1,900 µg/L would "render the existing treatment system useless." App. 1274 ¶ 34. H2M also noted that because the contamination was "only 700 feet away from the plant and [wa]s in the zone of capture of the supply

wells, it [wa]s only a matter of time until excessive contamination hit[] the supply wells.  This time frame could be within the next 12 months." *Id.*

### b.    Construction of Remediation Measures

#### i.    The Second AST

In October 2008, H2M submitted an engineering report (the "2008 Engineering Report") to the Board of Commissioners for the District (the "Board of Commissioners").  The 2008 Engineering Report, which addressed the need for a second AST, stated that a VPB conducted 700 feet upgradient from Plant 4 showed concentrations of VOCs that "[we]re too great and would overcome the existing treatment system at Plant No. 4 and not allow for complete removal of VOC contamination."  App. 764.  It also stated that Plant 4 was expected to "be significantly impacted by extremely high VOC levels in the very near future." App. 816.  Because the existing air stripping treatment system would be insufficient to address the expected increase, a second air stripping tower would be needed, at an estimated cost of $4.3 million.  In February 2009, H2M submitted the 2008 Engineering Report to the Nassau County Department of Health ("NCDOH") for approval of the proposed AST at Plant 4.  On June 30,

2009, NCDOH approved it and authorized the District to submit engineering plans for a second AST.

On July 23, 2009, the Board of Commissioners authorized the District to request bond financing for the construction of a second AST at Plant 4. On July 30, 2009, H2M prepared a Capital Improvement Plan ("CIP") which included (1) a new AST for Plant 4 designed to address VOCs "emanating from the former Grumman settling ponds [*i.e.,* OU3]," App. 1277, and (2) a new supply well. The CIP stated that "[w]ith the existing treatment system incapable of treating the higher influent levels expected to impact this site, the District must immediately implement the upgrade of the treatment system to properly treat both wells on site to avoid the loss of the production wells." App. 959. On July 31, 2009, the District asked the Towns of Oyster Bay and Hempstead (the "Towns") for $15.5 million in public bond financing to pay for the actions recommended in the CIP, including a second AST costing $3.7 million, and a new Plant 4 supply well costing $3.3 million. App. 1281.

On November 18, 2009, counsel for the District demanded that Northrop Grumman pay for VOC treatment system improvements at Plant 4.

Counsel also stated that the District had authorized "emergency implementation" of VOC treatment systems at Plant 4.

### ii. The Granular Activated Carbon Polishing System

On November 25, 2009, the Board of Commissioners held a meeting, the notice for which stated that "[n]ew information obtained at District and H2M meeting with Grumman on 11/16 revealed a much greater threat to public supply wells at [Plant] 4. Immediate action is required for well head protection by the summer 2010 pumping season." App. 1035. At the meeting, the District determined that the second AST would not be sufficient to address the higher level of VOCs at Plant 4, and it would need to add a granular activated carbon polishing system ("GAC"). The GAC "constituted an interim emergency wellhead treatment proposal." App. 1302 ¶ 34.

Toward that end, in a letter to the NCDOH dated December 17, 2009, H2M stated that "[e]mergency action is recommended and warranted to have the treatment system improvements immediately in place to address th[e] imminent threat" that the OU3 plume posed to Plant 4. App. 1005-06. H2M asked NCDOH to recognize the need for a GAC system to be installed expeditiously in addition to a second AST, because there was "not enough time

available to the District to wait for the completion of the new air stripping system." App. 1006. H2M stated that the contamination revealed by VPB-116 would overwhelm the Plant 4 treatment systems by spring 2010, and proposed that the GAC be operational by May 2010, and the additional AST be operational by May 2011.

### iii. Declaration of Emergency

On December 23, 2009, H2M sent a letter to the District stating that "the contamination found at [VPB 116] will likely reach Plant 4 by this spring" and recommended "that the District declare an emergency and expedite the planned improvements at Plant No. 4." App. 1054. The letter also cited three bids received by H2M for the first phase of the project, and recommended accepting the lowest bid.

On December 29, 2009, the Board of Commissioners adopted a resolution declaring that "an emergency situation affecting the public health, safety and welfare exists" and authorizing a contract to begin construction on an emergency GAC and a second AST. App. 1059. That same day, H2M sent DEC a letter stating that "[r]ecent VOC detections have been found in the effluent of both Plant Nos. 4 and 6. The District is restricted to the use of only one well at a

time at each facility." App. 1063. The letter also stated that, "based on the imminent threat that this plume has on the supply wells at Plant No. 4, one or more I[nterim] R[emedial] M[easures] are absolutely warranted." App. 1064. It stated: "[t]his is an emergency situation for the District, as it has restricted [Plant No. 4] to half capacity, and as the risk of losing Plant No. 4 for the peak pumping season will jeopardize the district's ability to meet peak domestic demand plus fire protection." App. 1068.

On January 5, 2010, the Town of Oyster Bay authorized a $13.95 million bond issuance for, among other things, "construction and equipping of water treatment facilities" at Plant No. 4. App. 1072. In February 2010, NCDOH approved the design and plan for the emergency GAC and the second AST. The GAC and AST were completed in January 2012.

### iv. Well 4-1 and Well 4-2 Removed from Service

In February 2006, the District detected combined radium-226 and radium-228 in Well-2 at levels of 5.69 picocuries per liter ("pCi/L").[7] The District

---

[7] The federal standard for combined radium-226 and radium-228 in drinking water is an MCL of 5 pCi/L. EPA, *Radionuclides Rule,* https://www.epa/gov/dwreginfo/radionuclides-rule (last visited Dec. 7, 2017).

-14-

detected combined radium-226 and radium-228 in Well-1 at 5.55 pCi/L in May 2006, and at 7.03 pCi/L in September 2010.

In December 2009, the District took Well 4-2 off line in preparation for the installation of "new VOC removal systems." App. 1103. In November 2010, the District took Well 4-1 off line in preparation for the installation of the GAC and AST. In February 2013, the District took Well 4-1 out of service because radium was detected at 5.87 pCi/L.

**B.** *Proceedings Below*

On November 18, 2013, the District filed this diversity suit against Northrop Grumman alleging negligence, trespass, and nuisance, and seeking to recover the costs of remediating pollution at Plant 4, as well as punitive damages.

On June 5, 2015, Northup Grumman moved for partial summary judgment seeking dismissal of the District's claims related to Plant 4 as time-barred.[8] On February 29, 2016, the magistrate judge issued an R&R

---

[8] The operative complaint here is the Second Amended Complaint, filed on March 20, 2015. On March 24, 2014, Northrop Grumman filed a motion to dismiss the original complaint, arguing that it was barred by the statute of limitations. The district court permitted limited discovery on the statute of limitations issue. By Order dated December 3, 2014, the district court allowed Northrop Grumman to convert the motion to dismiss into a motion for summary judgment.

recommending that the district court grant Northrop Grumman's motion for partial summary judgment. The magistrate judge determined that the District's claims were barred by CPLR § 214-c(2) because the statute of limitations had begun to run by November 2009 at the latest, based on actions taken by the District to remediate the contamination. This was over three years before the District filed this action on November 18, 2013. On March 31, 2016, the district court adopted the R&R in its entirety.

On June 15, 2016, the parties submitted a stipulation of voluntary dismissal without prejudice as to all of the District's claims not dismissed by the district court's March 31, 2016 order. On July 12, 2016, the district court entered final judgment as to all claims.

The District filed a timely notice of appeal on July 26, 2016. This appeal only addresses claims regarding Plant 4, as the District's remaining claims have been dismissed.[9]

---

[9] On September 6, 2016, the district court granted the District's Rule 54(b) motion, and final judgment was entered with respect to the "Plant 4" claims dismissed pursuant to the Partial Motion for Summary Judgment.

*DISCUSSION*

**A.** *Standard of Review*

This Court reviews a district court's decision on a motion for summary judgment *de novo* and reviews facts in the light most favorable to the losing party. *See Watson v. United States*, 865 F.3d 123, 130 n.5 (2d Cir. 2017) (denial of motion for summary judgment based on accrual date of claim is reviewed *de novo*); *Buttry v. Gen. Signal Corp.*, 68 F.3d 1488, 1492 (2d Cir. 1995) (applying *de novo* review to a grant of summary judgment regardless of whether the motion is "granted on the merits of the claim, or on an affirmative defense such as the statute of limitations").

Two issues relating to the statute of limitations are presented: (1) VOC contamination and (2) radium contamination.

**B.** *VOC Contamination*

    **1.** <u>**Applicable Law**</u>

The central issue is whether the District's claims for nuisance, trespass, and negligence based on VOC contamination are barred by the statute of limitations set forth in § 214-c(2). *See Bano v. Union Carbide Corp.*, 361 F.3d 696, 709 (2d Cir. 2004) ("[A] **damages** claim for latent injury to property resulting from the

seepage or infiltration of a toxic foreign substance over time is governed by the

§ 214-c limitations period."); *Jensen v. Gen. Elec. Co.*, 82 N.Y.2d 77, 82-83 (1993).

Under § 214-c(2):

> the three year period within which an action to recover damages for personal injury or injury to property caused by the latent effects of exposure to any substance or combination of substances, in any form, upon or within the body or upon or within property must be commenced shall be computed from *the date of discovery of the injury by the plaintiff* or from *the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff,* whichever is earlier.

N.Y. C.P.L.R. § 214-c(2) (emphasis added). The New York Court of Appeals has

held that, "[f]or purposes of CPLR 214-c, discovery occurs when, based upon an

objective level of awareness of the dangers and consequences of the particular

substance, 'the injured party discovers the primary condition on which the claim

is based.'" *MRI Broadway Rental, Inc. v. U.S. Min. Prods. Co.*, 92 N.Y.2d 421, 429

(1998) (internal citation omitted); *see also Atkins v. Exxon Mobil Corp.*, 780 N.Y.S.2d

666, 760 (3d Dep't. 2004). Thus, knowledge of both the "dangers and

consequences" posed by contamination and harmful impact are required. Mere

detection of contamination is not enough.

Moreover, the claim accrues when the plaintiff first discovers its

injury, regardless of whether the defendant's damaging conduct continues. *See*

*Bano*, 361 F.3d at 709; *Jensen*, 82 N.Y.2d at 88-89. This limitation only applies to claims for damages, not claims for injunctive relief. *Bano*, 361 F.3d at 710, *Jensen*, 82 N.Y.2d at 89-90 (CPLR § 214-c(2) applies "only to actions 'to recover damages.'"). As the statute of limitations is an affirmative defense, the defendant bears the burden of proof. *See* N.Y. C.P.L.R. § 3018(b).

The District filed its complaint on November 18, 2013. Northrop Grumman argues that the District either sustained its injury or knew of its injury -- the impact of contamination in the groundwater -- more than three years prior to filing because it was aware of the imminent threat posed by contamination and took remedial action well *before* November 18, 2010. The District argues that its injury did not occur until sometime after November 18, 2010 because the contamination did not actually enter its wells until *after* November 18, 2010. It is undisputed that both Northrop Grumman and the District knew contamination existed in the vicinity of Plant 4 before November 2010. The question is when an "injury" sufficient to trigger the statute of limitations occurred.

This Court addressed a similar issue in *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 725 F.3d 65 (2d Cir. 2013), which involved MTBE contamination in drinking water in New York City (the "City"). Beginning

in the 1980s, Exxon Mobil and other gasoline companies used MTBE as a gasoline additive to increase the oxygen content in gasoline. *Id.* at 78. Gasoline spills and leaks led to MTBE contamination in the City's groundwater.

MTBE was initially detected in the groundwater in wells in Queens at levels below the MCL. *See In re MTBE*, 2009 WL 2634749, at *2 (S.D.N.Y. Aug. 25, 2009). Exxon Mobil argued that the City's claims were barred by CPLR § 214-c(2) because the City knew about the "injury" -- the presence of MTBE contamination in drinking water -- more than three years before filing its action against Exxon Mobil. *In re MTBE Prod. Liab. Litig.*, 725 F.3d at 111. The City argued that the "injury" did not occur until "the concentration of MTBE . . . rose to a level at which a reasonable water provider would have treated the water." *Id.* at 111. It was undisputed that the City had detected MTBE at levels below the MCL over three years before filing suit. *See In re MTBE*, 2009 WL 2634749, at *1-2. Therefore, the issue was whether that was sufficient to trigger the accrual of a cause of action, that is, whether the statute of limitations began to run when the MTBE was first detected in the water or only after it reached concentrations that would cause a "reasonable water provider" to treat the groundwater. *In re MTBE*, 725 F.3d at 112.

The district court conducted an eleven-week jury trial, in three phases. *Id.* at 78-79, 83. In the third phase, the jury considered Exxon's claim that the City had failed to file within the three-year statute of limitations because it knew or should have known more than three years prior to filing that "there was a sufficient level of MTBE in the capture zone of the . . . wells" to cause an injury. *Id.* at 91. The jury found that the City's claims were timely because Exxon failed to meet its burden to show that the City knew or should have known of its injury three years prior to suit. *Id.* at 111.

On appeal, Exxon argued that no reasonable juror could have reached such a conclusion, because the statute of limitations was triggered once the City learned that it would need to treat the water sometime in the future. *Id.* at 111-112. In other words, Exxon argued, the statute of limitations began to run once the City could anticipate the need for remediation. In support of its argument that the City learned of this need more than three years before filing suit, Exxon pointed to the testimony of William Yulinsky, the Director of Environmental Health and Safety at the City's Department of Environmental Protection's Bureau of Waste Water Treatment. He testified that as early as September 1999, the City knew that, considering that "numerous potential

sources of MTBE exist[ed] within [one] mile of Station 6, the need to treat for MTBE should be anticipated." *In re MTBE*, 725 F.3d at 112. Yulinsky, however, also testified that in 1999 and 2000, "it was way too soon to determine what we were going to need to treat for." *Id.* at 91.

In upholding the verdict for the City, we held that the statute of limitations began to run only when "a reasonable water provider would have treated [the contaminated] groundwater." *Id.* at 112. In doing so, we rejected the idea that mere knowledge of a future need would trigger the statute of limitations:

> [A]nticipat[ing] a future need to remediate MTBE does not prove that the City knew in 1999 [before the statute began to run] that Station Six had already been contaminated or that the contamination was significant enough to justify an immediate or specific remediation effort.

*Id.* Hence, mere knowledge of the need for future action was insufficient.

We also held that the mere presence of contamination in the water, i.e., at low levels, was not enough to trigger the statute of limitations. The City conceded that MTBE was first detected in the City's water before the start of the statute of limitations period. *Id.* We held, however, that this was not fatal to the City's claims because Exxon did not prove that "a reasonable juror was required

-22-

to find that a reasonable water provider would have treated groundwater containing MTBE *at these concentrations*." *Id.* (emphasis added); *see also In re MTBE*, 2007 WL 1601491, at \*6 (S.D.N.Y. June 4, 2007) (holding that because "New York, like other states, does not have a zero-tolerance policy on contaminants in drinking water . . . . the mere detection of MTBE in wells at very low levels would not make a reasonable person aware of a legally-cognizable injury sufficient to trigger the statute of limitations").

In *MTBE*, the contaminant was already in the water source. The question was whether low levels would trigger the statute of limitations. We held that low levels would not, but we made clear that at some point before the MCL was exceeded, the statute of limitations could be triggered -- when the water source was sufficiently contaminated or the threat of contamination was sufficiently significant to justify immediate or specific remediation. *See In re MTBE Prod. Liab. Litig.*, 725 F.3d at 112.

## 2. <u>Applicable Law</u>

With these principles in mind, we turn to this case. Northrop Grumman argues that the statute of limitations began to run when the District learned of the potential need to remediate, or at least when a reasonable water

provider would have taken action to protect the water. The District argues that the statute of limitations should not begin until an "actual injury" is sustained, which it contends would be when contamination was actually detected in the water in the wells.

Two inquiries are required, one legal and one factual: First, as a legal matter, may a water provider bring suit for remediation damages before the water source is polluted, that is, when there is a threat of pollution? And second, assuming so, as a factual matter, did the threat of pollution reach the point where the water provider should have taken immediate and specific action?

### a. The Legal Question

The District argues that state law cases support their reading that an "actual injury" is required to trigger the statute of limitations. *See, e.g., Germantown Cent. Sch. Dist. v. Clark, Clark, Millis & Gilson, AIA*, 743 N.Y.S.2d 599, 602 (3d Dep't 2002), *aff'd*, 100 N.Y.2d 202 (2003) (holding that CPLR § 214-c(2) did not apply to claims to recover asbestos abatement costs caused by defendants' negligent abatement services because statute only applies to injuries caused by the "latent effects of exposure," and injury in this case was immediate); *Hanna v. Motiva Enter., LLC*, 839 F. Supp. 2d 654, 665 (S.D.N.Y. 2012) (holding that

presence of a strong odor on the property, installation of monitoring wells on nearby property, and being informed that pollution "may" be found "in or about" their property are not sufficient to trigger the statute of limitations).  These cases, however, do not support the proposition that contamination must be found in the wells, rather than merely in the groundwater leading into the wells, for an injury to be sustained.  Indeed, the Second Department has held that knowledge of "*possible* infiltration of contaminants into the vicinity of the subject property" is sufficient to trigger the statute of limitations, because the plaintiff had "obtained knowledge that would place 'a reasonable person on notice of the need to undertake further investigation to ascertain the scope of the contamination.'" *Benjamin v. Keyspan Corp.*, 963 N.Y.S.2d 128, 129 (2d Dep't 2013) (emphasis added) (citation omitted); *see also Oliver Chevrolet v. Mobile Oil Corp.*, 249 A.D.2d 793, 794 (3d Dep't 1998)  (holding that statute of limitations began to run with knowledge of gasoline discharge from leaking underground storage tanks but before gasoline was detected in well water because plaintiff was "aware that some amount of leakage had occurred").  These cases are consistent with our conclusion in *MTBE* that a water provider may sue if a water source has "already

been contaminated or . . . the contamination [is] significant enough to justify an immediate or specific remediation effort." 725 F.3d at 112.

In considering this issue, we must consider the purpose of a statute of limitations. As the Supreme Court noted in *California Public Employees' Retirement System v. ANZ Sec., Inc.*, 137 S. Ct. 2042 (2017), statutes of limitations are "designed to encourage plaintiffs 'to pursue diligent prosecution of known claims.'" *Id.* at 2049 (citing *CTS Corp. v. Waldburger*, 134 S. Ct. 2175, 2183 (2014)). Toward that end, the limitations period begins to run "when the cause of action accrues.'" *Id.* (citation omitted). In a property damage case, such as this, the cause of action accrues "when the injury occurred or was discovered." *Id.* (citation omitted).

With this purpose in mind, we reject the argument that the statute of limitations begins to run only after contamination is actually detected in an intake well. If a cause of action does not accrue until contamination is found in a well, a claim might never accrue, as contaminated portions of a nearby aquifer might not ultimately reach a well, or might be so toxic as to require shutting down an intake well before contact is made. Furthermore, a diligent water provider may take action to prepare its intake wells to treat incoming

contaminants prior to actual contact. The approach advocated by the District would lead to the odd result of encouraging water providers to allow contamination to reach the wells so that a cause of action could accrue. A diligent water provider that successfully prepares its wells to treat increased levels of incoming contaminants is still injured if it has to expend resources to prevent the pollution from reaching the drinking water.

We do not, however, hold that the statute of limitations commences when a reasonable water provider takes *any* action in anticipation of future contamination or has *any* knowledge of potential contamination. Such a holding could deter water providers from investigating leaks or taking steps to address future contamination for fear of triggering the statute of limitations. *See Hanna*, 839 F. Supp. 2d at 666 (holding that "[p]laintiffs should not be punished" for investigating source of odor of hydrocarbons on their property because such actions are not sufficient to trigger statute of limitations). As addressing water contamination is often a complex, multi-year process, a holding that *any* anticipatory action triggers the statute of limitations would run the risk of curtailing a municipality's ability to sue to recover costs. In *MTBE*, this Court specifically refused to hold that "anticipat[ing] a future need to remediate

[pollution]" by itself was enough to trigger the statute of limitations. *In re MTBE*, 725 F.3d at 112. Rather, we required knowledge that the contamination was significant enough to justify "an immediate or specific remediation effort." *Id.*

### b. The Factual Inquiry

Accordingly, we must consider whether the District was aware that the threat of contamination was sufficiently significant to warrant "immediate or specific remediation efforts." We agree with the district court that the record here establishes as a matter of law that the District had suffered injury and was aware of that injury before November 2010. Indeed, the indisputable facts show that before November 2010, the District took a myriad of substantial and specific steps to address the contamination, including:

- The District took numerous steps in 2008 and 2009 toward building a second AST for Plant 4 and a new supply well, steps that would require the expenditure of millions of dollars;

- In doing so, the District recognized in a CIP that "the existing treatment system [is] incapable of treating the higher influent levels expected to impact this site, [and the District] must *immediately* implement the upgrade of the treatment system," App. 959 (emphasis added);

- In 2009, the District proposed an additional emergency GAC system, to be operational by May 2010, and in January 2010, the Town of Oyster Bay authorized a $13.95 million bond issuance for additional treatment facilities at Plant 4, App. 1054;

- On December 23, 2009, H2M sent a letter to the District stating that "the contamination found at [VPB 116] will likely reach Plant 4 by this spring" and recommended that the District "declare an emergency and expedite the planned improvements at Plant No. 4," App. 1054;

- On December 29, 2009, the Board of Commissioners declared such an emergency; and

- In December 2009, the District took Well 4-2 off line in preparation for the installation of the GAC/AST.

A reasonable jury could only conclude that these actions taken by the District prior to November 2010 constituted "immediate and specific remediation efforts" by a reasonable water provider to address pollution. As a result, the District's claims for damages arising from contamination of Plant 4 accrued before November 18, 2010, and thus are barred by the statute of limitations.

**C.**     *Radium Contamination*

The District alleges that radium was detected in Well 4-1 and Well 4-2 in 2013, and therefore its suit against Northrop Grumman in November 2013 was timely. Northrop Grumman argues that the District knew of the radium contamination in 2006, and therefore the claim is barred by the statute of limitations.

It is undisputed that the District detected radium in its wells at the following levels at the following times:

> February 2006      5.69 pCi/L in Well 4-2
> May 2006      5.55 pCi/L in Well 4-1
> September 2010      7.03 pCi/L in Well 4-1
> January 2013      5.87 pCi/L in Well 4-1

The R&R recommended dismissal of the District's radium claims because the record established that: (1) the District could not "determine the source and seriousness of any radium contamination," in part because radium is naturally occurring in the water on Long Island, and (2) the District was aware of radium in 2006, and the level in 2013 was lower than the level in 2006, more than three years prior to suit. The district court adopted the R&R concluding that the radium claim was barred by CPLR § 214-c(2) because the District had knowledge of the contamination before November 2010.

On appeal, the District does not deny the earlier knowledge of the presence of radium, but argues that it did not know that the source of the radium was the Grumman site, rather than merely naturally occurring, until it filed this suit in 2013 and obtained information about the source from DEC.

Northrop Grumman argues that the District waived its argument concerning the timeliness of this claim by failing to raise that point in its objections to the R&R. It argues that the only objection raised by the District was an assertion that the district court should have considered new radium sampling results from a former Northrop Grumman property as a factual basis to establish causation.

The District's argument fails. Even if the District did not know the source of the radium until 2013 at the earliest, its claim is still barred by the statute of limitations because suit was filed more than five years after the District discovered the injury. While CPLR § 214-c(2) does not carve out an exception for delay in discovering the source of the injury, CPLR § 214-c(4) extends the limitations period to one year after the discovery of the cause of the injury in these circumstances:

> [n]otwithstanding the provisions of subdivisions two
> and three of this section, where the discovery of the

cause of the injury is alleged to have occurred less than five years after discovery of the injury or when with reasonable diligence such injury should have been discovered, whichever is earlier, an action may be commenced or a claim filed within one year of such discovery of the cause of the injury.

N.Y. CPLR § 214-c(4). Hence, *if* a plaintiff discovers an injury *and* discovers within the next five years the cause of that injury, the statute of limitations is extended to one year after the discovery of the cause.

Here, the District first learned of radium contamination in 2006. It claims it did not learn of the source of the contamination until discovery began in this suit in 2013. There was a seven-year gap between the discovery of the injury in 2006 and the discovery of the source of the injury in 2013. As a result, the District's claims regarding radium are also time-barred.

### *CONCLUSION*

For the reasons set forth above, we **AFFIRM** the decision of the district court.